**PARSIPPANY HOTEL MANAGEMENT CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 95–1529.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1996.

Decided Nov. 8, 1996.

Karl M. Terrell, Atlanta, GA, argued the cause and filed the briefs for petitioner.

Daniel J. Michalski, Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret G. Neigus, Supervisory Attorney, were on the brief.

Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Parsippany Hotel Management Company ("Parsippany," the "Hotel," or the "Company") petitions for review of a decision of the National Labor Relations Board ("NLRB" or "Board") finding that Parsippany violated the National Labor Relations Act (the "NLRA" or the "Act") by engaging in unlawful surveillance of its employees; giving an unlawful, anti-union speech; and discriminatorily disciplining and discharging a union activist employee. Respondent, the NLRB, cross-petitions for enforcement of its order. Parsippany argues that the administrative law judge ("ALJ") erred in permitting the Board's General Counsel to amend his complaint to include the allegation that Parsippany violated the Act by giving an anti-union speech to company employees, and that there is insufficient evidence on the record as a whole to support the Board's findings on the other charges. We conclude that there is sufficient evidence to support the Board's findings on all charges, and that Parsippany waived any claim that the Board erred in permitting the General Counsel to amend his complaint to include the anti-union speech allegation. We, therefore, dismiss Parsippany's petition and grant in toto the Board's application for enforcement.

## I. BACKGROUND

Parsippany operates a hotel in Parsippany, New Jersey, at which Joseph LaRussa had been employed as a banquet server from October 1991, until discharged in June 1993. This case arises out of a union organizing effort that began at Parsippany in early 1993. In January 1993, after the Hotel's management decided to amend its method of compensating employees from a gratuity commission to an hourly system, LaRussa approached the Hotel Employees and Restaurant Employees International Union, Local 69 (the "Union") for assistance in organizing the Hotel's employees. Shortly thereafter, union representative John Agatos provided LaRussa with union authorization cards to distribute among the Parsippany employees. LaRussa distributed the cards to employees on company facilities during non-work hours. In addition, he attended several Union-sponsored employee meetings. In February 1993, the Union filed with the Board a petition for a representation election.

Upon learning of the union organizing activity, Hotel General Manager Robert Hermany conducted a mandatory meeting of banquet department employees in February. Hermany told the employees that he did not want a third party running the Hotel. Then, holding up a union authorization card, Hermany informed the employees that he did not want to see such cards and that whoever was distributing them had better stop.

On March 3, the Board conducted a hearing to determine the appropriate bargaining unit of employees that would be eligible to vote in the upcoming representation election. LaRussa attended this hearing to testify on the Union's behalf. Numerous company offi-

cials were present at the hearing and witnessed LaRussa's participation in the hearings on the Union's behalf. The hearing, however, was held during LaRussa's work hours, and he missed work to attend the meeting without giving proper notice to his employer of his intent to be absent. As a result of his failure to arrive at work as scheduled, LaRussa received a "verbal warning." Two weeks later, on March 17, 1993, LaRussa received his first written warning for screaming abusively and cursing at a female manager, Bianca Sorenson. Less than a month later, on April 4, 1993, LaRussa arrived 54 minutes late for work, and for this Parsippany issued LaRussa his second written warning.

In the meantime, the scheduled date of the representation election was nearing. In the week preceding the election, Parsippany brought four security guards from other hotels to work at the New Jersey facility as part of a "union campaign task force." On April 22, the representation election was held, and the Union lost by a two-to-one margin.

Several weeks later, on May 6, LaRussa received his third written warning for punching into work thirty minutes early two days in a row. Finally, on June 13, LaRussa failed to report for a scheduled shift and received his fourth and final warning two days later. LaRussa was then fired on June 18 in conformity with Parsippany's progressive discipline policy which provides that an employee who receives three written warnings in a twelve-month period is subject to discharge.

In the months following these events, the Union filed several unfair labor practice charges against Parsippany. After investigation of these charges, the Board's General Counsel issued a complaint alleging violations of Sections 8(a)(1), (3), and (4) of the NLRA. 29 U.S.C. §§ 158(a)(1), (3), and (4) (1994). The charges contained in the complaint were heard before an ALJ in May and June of 1994. This complaint contained no allegations relating to the anti-union speech given by Hermany in February 1993. However, in the midst of the hearing before the ALJ, the General Counsel moved to amend his complaint to include an additional allegation that Hermany's speech violated Section 8(a)(1) of the Act. The ALJ allowed the amendment over objection by Parsippany, but recessed the hearing for approximately six weeks. Upon completion of the hearing, the ALJ concluded that Parsippany had violated the Act by discriminatorily disciplining LaRussa on April 4, May 6, and June 13, and discharging him on June 18. The ALJ further found that Parsippany had engaged in unlawful surveillance of its employees and that Hermany's anti-union speech to employees violated the Act. However, the ALJ concluded that neither the verbal warning to LaRussa on March 3 nor the written warning to him on March 17 was discriminatory.

The Hotel appealed the ALJ's findings to the Board. A three-member panel of the Board adopted the ALJ's rulings, findings, and conclusions in part. *Parsippany Hotel Management Co.*, 319 N.L.R.B. No. 22, at 1, 1995 WL 579213 (1995). The Board agreed with the ALJ's finding that both the verbal warning issued to LaRussa on March 3 and the first written warning issued on March 17 were nondiscriminatory. *Id.* As for the ALJ's finding that Parsippany had violated the Act by issuing the second written warning to LaRussa on April 4, the Board adopted the ALJ's finding that the General Counsel had established a *prima facie* case that that warning was motivated by LaRussa's union activities, but then found that Parsippany would have issued the warning even in the absence of LaRussa's protected activities. As a result, the Board concluded that the April 4 warning did not violate the Act. *Id.* at 2. The Board affirmed the ALJ's findings concerning the remaining charges against Parsippany. *Id.* at 1.

As a remedy for these violations of the Act, the Board ordered that Parsippany cease and desist from engaging in the violations. In addition, the Board ordered that LaRussa be reinstated to his former job and be made whole for any losses suffered as a result of Parsippany's unlawful conduct. Parsippany was also required to post a notice at the facility announcing to employees that Parsippany would no longer engage in those

violations of the Act which the Board determined Parsippany had committed.

Parsippany petitioned this court to review the Board's findings. In its petition for review, Parsippany argues that the Board erred in affirming the ALJ's decision to permit the General Counsel to amend his complaint to add the allegation that Hermany's anti-union speech violated Section 8(a)(1) of the Act. Further, Parsippany argues that the Board's findings were not supported by substantial evidence in the record.

## II. ANALYSIS

### A. The Amendment of the General Counsel's Complaint

▮ We first consider Parsippany's claim that the ALJ erred in permitting the General Counsel to amend his complaint to include an allegation concerning Hermany's anti-union speech.

#### 1. NLRA Section 10(b)

Section 10(b) of the NLRA provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." 29 U.S.C. § 160(b). In *N.L.R.B. v. Fant Milling Co.*, 360 U.S. 301, 309, 79 S.Ct. 1179, 1184, 3 L.Ed.2d 1243 (1959), the Supreme Court held that Section 10(b) does not preclude the Board from making allegations of unfair labor practices which occurred outside the six month statute of limitations so long as such allegations are "related" to charges timely filed with the Board. This court has interpreted *Fant Milling* as requiring a *"significant factual affiliation"* between matters prosecuted by the Board and the activity alleged in the Union's charge. *Drug Plastics & Glass Co. v. N.L.R.B.*, 44 F.3d 1017, 1020 (D.C.Cir. 1995) (quoting *G.W. Galloway Co. v. N.L.R.B.*, 856 F.2d 275, 280 (D.C.Cir.1988)). Similarly, the Board has developed a three-part test that asks whether complaint allegations and charge allegations are "closely related." *Nickles Bakery of Indiana, Inc.*, 296 N.L.R.B. 927, 928, 1989 WL 224354 (1989).

There is no dispute that the amendment to the General Counsel's complaint to include

the anti-union speech allegation was made more than six months after the speech was given. The Hermany speech was given in February 1993, while the charge involving the speech was not added to the complaint until May 1994. The Board, therefore, argues that the amendment was permissible because the anti-union speech charge was "closely related" to the other charges against Parsippany. Under this court's Section 10(b) jurisprudence, Parsippany would appear to have a strong argument that the anti-union speech charge was not "closely related" to the charges in the General Counsel's complaint. However, we need not address this Section 10(b) issue because it was not raised by Parsippany at any time before the Board.

Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). The Board's regulation interpreting this provision requires that an exception to an ALJ's ruling inform the Board of "the questions of procedure . . . to which the exception is taken" as well as "the grounds for the exception." 29 C.F.R. § 102.46(b)(1) (1996). While we have not required that the ground for the exception be stated explicitly in the written exceptions filed with the Board, we have required, at a minimum, that the ground for the exception be "evident by the context in which [the exception] is raised." *Consolidated Freightways v. N.L.R.B.*, 669 F.2d 790, 794 (D.C.Cir.1981).

In this case, Parsippany's exception to the ALJ's decision to permit the amendment stated only that "[t]he ALJ erred in allowing . . . the General Counsel to amend his complaint." While we have found vague exceptions to preserve an issue for appeal under limited circumstances, *e.g., N.L.R.B. v. Blake Constr. Co.*, 663 F.2d 272, 283–84 (D.C.Cir. 1981) (holding that petitioner's exception "to the ALJ's conclusions of law as 'based on misstatements of facts, mistaken premises, suppositions, hearsay, and misapplication of law'" sufficiently preserved a due process issue), we conclude that Parsippany's vague exception was insufficient to provide notice to

the Board that the ground for the exception was Section 10(b). When the General Counsel moved before the ALJ to amend his complaint to include the anti-union speech allegation, Parsippany's counsel suggested orally to the ALJ that there "may be a statute of limitations problem." However, under the plain language of Section 10(e), an issue may not be preserved for appeal simply by raising it before the ALJ. Similarly, the fact that the ALJ discussed the Section 10(b) issue in his opinion which was adopted by the Board is also insufficient to satisfy the requirements of Section 10(e). *See Local 900 Int'l Union of Electrical, Radio and Machine Workers v. N.L.R.B.*, 727 F.2d 1184, 1191 (D.C.Cir.1984) (stating that even "discussion of an issue by the Board does not necessarily prove compliance with section 10(e)").

The cases cited by Parsippany do not require a contrary conclusion. In *Blake Construction*, we held that petitioner's vague exception to the ALJ's "misapplication of law" was sufficient to preserve an issue for appeal when petitioner's "brief in support of its exceptions" adequately put the Board on notice that petitioner was objecting to the ALJ's ruling on due process grounds. 663 F.2d at 283; *see also Consolidated Freightways*, 669 F.2d at 794 (noting that petitioner had discussed the ground for its exception "in its brief to the Board"). In this case, it appears that Parsippany did not set forth the Section 10(b) issue in any detail before the Board. Parsippany also cites *May Dep't Stores Co. v. N.L.R.B.*, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945), in support of its argument that the Section 10(b) claim was not waived. *May*, however, is easily distinguishable from this case. In *May*, the petitioner asserted before the Board that the ALJ's order was "not supported or justified by the record," *id.* at 386 n. 5, 66 S.Ct. at 209 n. 5, an exception far more informative than Parsippany's cursory allegation that "the ALJ erred."

The facts in *Davis Supermarkets, Inc. v. N.L.R.B.*, 2 F.3d 1162 (D.C.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994), cited by petitioner, also differ dramatically from the facts here. In *Davis*, the Board argued that while the employer had "specifically objected" in its exceptions to the ALJ's findings, the claim should be barred because the employer did not brief and argue the issue to the Board. *Id.* at 1174. We dismissed the Board's argument, relying on a long line of circuit precedent holding that briefing and argument before the Board is unnecessary to preserve an issue for appeal under Section 10(e). *Id.* (citing *Local 900*, 727 F.2d at 1192). In this case, by contrast, Parsippany failed "specifically [to] object" to the ALJ's decision to allow the complaint amendment, as well as failing to brief the issue.

Parsippany's reliance on this court's opinion in *Local 900* is also of no avail. In *Local 900*, it was the General Counsel who excepted to the ALJ's decision, urging the Board to adopt the rationale expressed by two Board members in another case. 727 F.2d at 1193. In its cross-exceptions to the Board, the union supported the ALJ's reasoning. *Id.* In light of the General Counsel's own exceptions which highlighted the particular issue, we concluded that the union's somewhat imprecise cross-exception was sufficient to preserve the issue for appeal. *Id.* In this case, there is no parallel information source to put the Board on notice. Thus the *Local 900* case is inapposite.

■ Moreover, even had Parsippany raised the Section 10(b) issue before the Board, it would nonetheless be barred from consideration by this court, as it did not raise the issue in its opening brief. *E.g., Corson & Gruman Co. v. N.L.R.B.*, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990) (per curiam). In the course of arguing in its opening brief that it was error to permit the General Counsel to amend its complaint, not once did Parsippany make mention of Section 10(b) or use words such as "closely related," "related," or "significant factual affiliation," or otherwise alert the court and respondent to the Section 10(b) argument. Parsippany asserts that while it did not specifically mention Section 10(b) in its opening brief, it nonetheless cited and relied upon case law applying that provision. The only case to which Parsippany cited on the amendment issue in its opening brief was *Redd–I, Inc.*, 290 N.L.R.B. 1115 (1988).

That case, however, contains discussion of both the Section 10(b) and due process issues arising out of an ALJ's decision to allow an amendment to a complaint. The emphasis in Parsippany's opening brief on how the amended complaint caught it "completely flat-footed," caused "severe[ ] prejudice," and involved a charge it "knew nothing about" because it "received no prior notice," Petitioner's Brief at 31, supports the due process argument it does make, and certainly does not clearly raise the Section 10(b) claim. *See Alabama Power Co. v. Gorsuch,* 672 F.2d 1, 7 (D.C.Cir.1982) (per curiam) (collecting cases discussing the degree of specificity with which a party must raise an issue on appeal).

### 2. Due Process

■ Mid-hearing amendments to unfair labor practices charges raise not only Section 10(b) concerns, but also due process issues. U.S. Const. amend. V ("[N]or [shall any person] be deprived of . . . property without due process of law"). The concerns underlying a due process claim are far different from those underlying Section 10(b). The purpose of Section 10(b) is "to prevent the issuance by the Board of complaints upon charges based upon stale unfair labor practices." *N.L.R.B. v. Brown & Root, Inc.,* 203 F.2d 139, 146 (8th Cir.1953); *N.L.R.B. v. Pennwoven, Inc.,* 194 F.2d 521, 524 (3d Cir.1952). The Due Process Clause, by contrast, serves to "secure the individual from the arbitrary exercise of the powers of government" by requiring "the government to follow appropriate procedures." *Fagan v. City of Vineland,* 22 F.3d 1296, 1321 (3d Cir.1994) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).

As we noted above, when the General Counsel moved before the ALJ to amend his complaint to include the anti-union speech allegation, Parsippany's counsel responded that the amendment "caught [him] flat-footed," "severely prejudiced" him, and was made with "no advance notice whatsoever." While this response by Parsippany's counsel arguably raised a due process claim, as discussed above, the fact that an issue was raised before an ALJ is insufficient to preserve that issue for appeal. And as with the Section 10(b) claim, Parsippany's cursory exception before the Board to the ALJ's ruling was insufficient to preserve the issue for appeal. Moreover, even had the due process issue been preserved for appeal, we likely would have found it to be without merit. After the ALJ permitted the General Counsel to amend his complaint, the hearing was recessed for more than six weeks—from May 11 to June 23. This break in the hearing in all likelihood provided Parsippany with an adequate opportunity to prepare its defense to the new charge.

### B. Substantial Evidence

■ Parsippany has preserved for appeal its claim that several of the Board's rulings were not supported by substantial evidence on the record as a whole. This court's review of a Board decision to determine whether it is supported by substantial evidence is highly deferential. *Gold Coast Restaurant Corp. v. N.L.R.B.,* 995 F.2d 257, 263 (D.C.Cir.1993). This high degree of deference does not mean that we will " 'merely rubber stamp NLRB decisions.' " *Id.* (quoting *Avecor, Inc. v. N.L.R.B.,* 931 F.2d 924 (1991)). Rather, we look carefully at the record to assure that the Board's findings of fact "are supported by substantial evidence in the record as a whole." *Id.* "If there is substantial evidence to support the Board's conclusions, we will uphold the Board's decision even if we would have reached a different result had we considered the question *de novo.*" *Synergy Gas Corp. v. N.L.R.B.,* 19 F.3d 649, 651 (D.C.Cir.1994).

Parsippany does not contend that the Board's conclusion concerning Hermany's anti-union speech was without substantial evidence. Accordingly, we grant the Board's cross-petition for enforcement with respect to this violation of Section 8(a)(1) of the Act. Parsippany does, however, contest the Board's finding that Parsippany engaged in unlawful surveillance and discriminatorily disciplined and discharged LaRussa. It is to those findings that we now turn.

### 1. Surveillance

■ During the days preceding the representation election, Parsippany reassigned ad-

ditional security guards to the New Jersey facility. The ALJ found that some of these guards engaged in surveillance of employees in violation of Section 8(a)(1) of the Act. The Board adopted the ALJ's findings of fact and affirmed the ALJ's conclusion of law. *See Parsippany Hotel Management Co.*, 319 N.L.R.B. No. 22, at 1.

Section 8(a)(1) of the NLRA makes it "an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the[ir] right[ ]" to self-organize. 29 U.S.C. § 158(a)(1). The courts have held that an employer's conduct violates Section 8(a)(1) if it creates the impression among employees that they are subject to surveillance. *Gold Coast*, 995 F.2d at 266. This prohibition against surveillance does not prevent employers from " 'observ[ing] public union activity, particularly where such activity occurs on company premises' " so long as the employer does not engage in conduct that is so " 'out of the ordinary' " that it creates the impression of surveillance. *Id.* (quoting *N.L.R.B. v. Southern Maryland Hosp. Ctr.*, 916 F.2d 932, 938 (4th Cir.1990)). Even during the course of an organizing campaign, an employer has the right to maintain a security force at the level "necessary to the furtherance of legitimate business interest." *See The Broadway*, 267 N.L.R.B. 385, 401 (1983).

The ALJ heard testimony from Robert Braga, one of the guards transferred to the New Jersey facility, that upon arriving at his new assignment he and three other security guards attended a meeting with Lisa Hugo and Peter Coutis, two members of Hotel management. Braga testified that at this meeting the guards were told of some specific individuals who were involved in the union campaign, though the guards were not explicitly told to watch these individuals. Braga further testified that LaRussa was specifically pointed out to the guards. The ALJ also heard testimony from LaRussa, who recounted how the security guards on one occasion approached him and some of his co-employees asking them "Why do you want a union? This is a great company to work for?" Michael Romano, another Parsippany employee, also testified that in the weeks preceding the election he was constantly ob-

served by "two men [who] did not wear badges or name tags." Romano specifically recounted an instance in which he and La-Russa were followed by these men as they took a walk through the parking lot during a work break. Another Parsippany employee, Harriet Vaccaro, also testified about an instance in which two men observed her and LaRussa for over three hours as they worked a luncheon. Ruth Hoffman, another Parsippany employee who also worked that luncheon, confirmed Vaccaro's version of events. The ALJ found these witnesses to be credible and credited their testimony.

Parsippany argues that it had a "legitimate business interest" in increasing the size of its security force at the facility in the days preceding the representation election. According to Parsippany, the purpose of the increased security was to uphold its common law duty of maintaining peace and safety at the hotel. Given the recent decrease in the hotel security force from eight guards to three and the belief on the part of management that the election could create "some outside activity ... detrimental to ... guests," Parsippany asserts that it was arbitrary for the Board to conclude that the increase in security was unlawful. Parsippany further contends that there is no substantial evidence that the security guards did anything "out of the ordinary." According to Parsippany, the presence of security guards both in the parking lot and lobby of the hotel is hardly unusual and cannot constitute surveillance.

We agree with Parsippany that it had a "legitimate business interest" in protecting the health and well-being of hotel guests. The ALJ, however, concluded that the additional security officers were brought to the facility to engage in surveillance of employees rather than to protect the well-being of hotel guests. Given the extensive testimony by employees that they were observed constantly and for extended periods of time, as well as the testimony of one of the guards that union activists, including LaRussa, were specifically identified to the guards, we are unable to conclude that the ALJ's finding of unlawful surveillance was arbitrary.

## 2. Discipline and Discharge of LaRussa

In addition to engaging in unlawful surveillance of LaRussa and several co-employees, Parsippany also disciplined LaRussa on five separate occasions and ultimately discharged him. On March 3, 1993, LaRussa failed to arrive at work because he was testifying before the Board concerning the upcoming representation election. Because LaRussa failed to give proper notice to Parsippany that he would be absent, he received a verbal warning. Exactly two weeks later, on March 17, LaRussa received his first written warning for screaming abusively and cursing at a female manager. On April 4, LaRussa received a second written warning when he arrived 54 minutes late to work without giving proper notice. On May 6, he received his third written warning for punching in early. LaRussa received his fourth and final written warning on June 15 for failing to report for his scheduled shift on Sunday, June 13. LaRussa was then discharged on June 18 under Parsippany's progressive discipline policy.

The May 6 warning arose out of the change Parsippany made to its compensation policy in January 1993. As discussed above, in January, Parsippany changed its method of compensation from commission to an hourly system. Under the former system of compensation, an employee's income was not determined by the number of hours worked. Thus, it was common for Parsippany's employees to clock in early for work under the old system. Though the method of compensation changed in January 1993, Parsippany's employees did not immediately alter their clock-in habits. As the ALJ found, even through May 1993, it was quite common for employees to clock in early for work. On May 5 and 6, LaRussa clocked in for work approximately one-half hour early.

To address the problem of early clock-ins, Christine Wester, the banquet manager at the facility, held a meeting with the banquet workers sometime in early May and informed them that they were no longer to clock in early. Though LaRussa had been excused from this meeting for a doctor's appointment, the ALJ found that he was informed of the new clock-in policy at a later time. However, the exact date on which the meeting was held and on which LaRussa was informed of the new clock-in policy was in dispute. After hearing evidence from both sides, the ALJ was able to conclude only that the meeting occurred "after May 4." Then, based on testimony that Wester did not work on May 5, the ALJ concluded that LaRussa was not informed of the new clock-in policy until after he arrived and clocked in early for work on May 6. The ALJ found that LaRussa had not been informed of the new clock-in policy when he clocked in early on May 5 and 6, and received a written warning for violating the policy.

LaRussa received his fourth and final written warning for failing to report to work as scheduled on Sunday, June 13. The ALJ found that on Tuesday, June 8, LaRussa attempted to ask Wester if he could have Sunday off so that he could attend the birthday party for the daughter of his co-employee, Melissa Brennan. Wester was busy at the time and told LaRussa to talk to her the following day about having Sunday off. The ALJ found that LaRussa called Wester the next day, Wednesday, as instructed and left a message with the catering sales manager, Siros Kalantary, to remind Wester that LaRussa needed Sunday off. On Thursday, Wester informed LaRussa that she had received his message but was unable to give him Sunday off. LaRussa then offered to locate a substitute for his scheduled Sunday shift. Later on Thursday, LaRussa contacted Marge McKay and asked her to work his Sunday shift for him. The ALJ found that McKay agreed to fill in for LaRussa. However, the ALJ found that when LaRussa informed Wester that McKay would cover his shift, Wester rejected McKay as a substitute because McKay had previously refused to work on Sundays when Wester so requested. Despite Wester's rejection of McKay as a substitute, LaRussa failed to appear for work on Sunday. Two days later, LaRussa was issued his fourth written warning for failure to arrive for his scheduled shift. On June 18, LaRussa was fired under Parsippany's progressive discipline policy which provided that an employee was subject to discharge if he received three or more written warnings.

Several employees testified and the ALJ found that Parsippany's established company policy was that an employee could take a day off if the request was made by the prior Wednesday, the day on which the work schedule was posted. An employee could still take a day off if the request was made after the prior Wednesday so long as that employee was able to locate another employee to cover his shift. The ALJ found that the only exception to this rule was for extremely busy days when all employees were needed.

The ALJ concluded that both Parsippany's verbal warning to LaRussa on March 3 as well as its first written warning to him on March 17 were nondiscriminatory. However, the ALJ found that the final three written warnings issued to LaRussa as well as his discharge on June 18 were all motivated by anti-union animus on the part of Parsippany and would not have occurred absent such animus. The Board adopted the ALJ's findings and affirmed the ALJ's conclusions of law except for that relating to the written warning of April 4. Regarding the April 4 warning, the Board accepted the ALJ's finding that the warning was motivated by LaRussa's union activities, but then concluded that Parsippany would have issued the warning even in the absence of LaRussa's protected conduct. As a result, the Board concluded that while Parsippany had violated Sections 8(a)(1), (3) and (4) of the Act by disciplining LaRussa on May 6 and June 13 and discharging him on June 18, Parsippany had not violated the Act by disciplining LaRussa on April 4. *See Parsippany Hotel Management Co.*, 319 N.L.R.B. No. 22, at 1.

██ As we noted above, an employer violates Section 8(a)(1) of the NLRA if it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of the[ir] right[ ]" to self-organize. 29 U.S.C. § 158(a)(1). Section 8(a)(3) specifically declares an employer in violation of the Act if it discriminates "in regard to ... tenure of employment or any term or condition of employment to ... discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Section 8(a)(4) provides that it is an unfair labor practice for an employer "to discharge or otherwise dis-

criminate against an employee because he has ... given testimony under this subchapter." 29 U.S.C. § 158(a)(4). While these provisions of the Act prohibit the discharge of an employee "because of union activity," even an employee engaged in union activity may be discharged for "reasons unrelated to the employee's union activities." *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 394, 103 S.Ct. 2469, 2470, 76 L.Ed.2d 667 (1983). Therefore, in those instances in which an unlawful discharge is alleged, "the critical question is whether anti-union considerations spurred [the] firing." *Synergy Gas Corp.*, 19 F.3d at 652.

In *Transportation Management Corp.*, the Supreme Court approved the test developed by the Board in *Wright Line, Inc.*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), for determining whether the discipline of a particular employee violated the Act. Under the *Wright Line* test, the General Counsel has the "burden of persuading the Board that an antiunion animus contributed to the employer's decision to discharge an employee." *Transportation Management*, 462 U.S. at 395, 103 S.Ct. at 2471. The Board need not find that an employee's union activity was the sole motive for the discharge; it is sufficient for purposes of establishing a violation of the Act that union affiliation or activity was one of the reasons for the discharge. *Id.* at 398, 401, 103 S.Ct. at 2472–73, 2474. In order to establish a *prima facie* case of unlawful motivation under the first part of the *Wright Line* test, the General Counsel must prove "not only that the employer knew of the employee's pro-union activities, but also that the timing of the alleged reprisal was proximate to the protected activities and that there was anti-union animus to link the factors of timing and knowledge to the improper motivation." *MECO Corp. v. N.L.R.B.*, 986 F.2d 1434, 1437 (D.C.Cir.1993) (internal quotation omitted). However, even if the Board finds that the discharge of an employee was motivated in part by the employer's anti-union animus, an employer may avoid a finding that it violated the Act under the second prong of the *Wright Line* test by demon-

strating that the employee "would have been fired even if he had not been involved with the union." *Transportation Management,* 462 U.S. at 395, 103 S.Ct. at 2471.

The ALJ found that Parsippany was motivated by anti-union animus when it issued written warnings to LaRussa on May 6 and June 15 and discharged him on June 18. As evidence of this illicit motivation, the ALJ pointed to Parsippany's previous displays of anti-union animus, specifically General Manager Hermany's anti-union speech as well as the company's unlawful surveillance of employees. The ALJ further inferred anti-union animus from the "pretextual nature" of the warning and discharge of LaRussa. According to the ALJ, the May 6 discipline of LaRussa was unjustified because LaRussa was not notified of the new policy against clocking in early until after he received the written warning for such on May 6. The ALJ also found that the written warning issued to LaRussa on June 15 was unjustified. According to the ALJ, Wester gave "no valid reason" for denying LaRussa's request that he be allowed to take Sunday off. Moreover, Wester's proffered reason for refusing to accept McKay as LaRussa's substitute was "rather transparent." Having previously found that Parsippany was well aware of LaRussa's union activity, the ALJ concluded that the warnings and discharge of LaRussa were motivated by anti-union animus and would not have occurred absent LaRussa's union activity.

On appeal, Parsippany contends that the finding that Parsippany violated the Act by disciplining and discharging LaRussa was in error because the General Counsel failed to establish a *prima facie* case of anti-union animus. Citing *MECO Corp.,* 986 F.2d at 1437, Parsippany first argues that the Board erred in relying on General Manager Hermany's anti-union speech as evidence of Parsippany's anti-union animus. According to Parsippany, because Hermany " 'had [nothing] to do with the discharge of' ... the discriminatee[ ],' " his anti-union comments " 'constitute less than substantial evidence of anti-union animus.' " *MECO Corp.,* 986 F.2d at 1437. Moreover, Parsippany asserts that Hermany's speech provides no evidence of anti-union animus because it "did not contain any 'threat of reprisal or force or promise of benefit.' " Parsippany also contends that the company's surveillance activity does not indicate anti-union animus because the surveillance, if any, was *de minimis* and lacked a nexus with the disciplinary action taken against LaRussa.

As an initial matter, Parsippany's assertion that Hermany's speech is not evidence of anti-union animus merely because the speech contained no "threat of reprisal or force or promise of benefit" is without merit. A company's "open hostility toward Union activity, and its 8(a)(1) violations, are clearly sufficient to establish" anti-union animus on the part of that company. *Teamsters Local Union No. 171 v. N.L.R.B.,* 863 F.2d 946, 956 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989). In this case, Hermany's anti-union speech prohibiting all union solicitation on company premises plainly violated Section 8(a)(1) of the Act. *See Restaurant Corp. of America v. N.L.R.B.,* 827 F.2d 799, 804–05 (D.C.Cir. 1987). The ALJ thus properly relied on Hermany's anti-union speech as evidence of Parsippany's anti-union animus.

Parsippany's assertion that the Hermany speech did not establish anti-union animus because Hermany was not involved in the discharge and discipline of LaRussa is equally without merit. Parsippany's reliance on our opinion in *MECO Corp.,* 986 F.2d at 1437, is misplaced. In *MECO Corp.,* we held that the prior anti-union comments of two low-level factory supervisors were insufficient to establish that an employee was discharged because of anti-union animus where "neither supervisor ... had anything to do with [the] discharge." *Id.* Hermany was not a low-level supervisor, but a high-level corporate manager. While it may be unreasonable to attribute to a corporation the anti-union sentiment expressed by low-level supervisors, *see Pittsburgh S.S. Co. v. N.L.R.B.,* 180 F.2d 731, 741 (6th Cir.1950), *aff'd.,* 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479 (1951), it is eminently reasonable to assume that high-level corporate managers speak on behalf of the company when they express anti-union animus. As a result, the

fact that Hermany was not personally involved in the discharge of LaRussa is irrelevant. There is no evidence in the record that Parsippany repudiated Hermany's speech or that Hermany was removed from his position as General Manager because of his speech. Absent such evidence, we cannot say that the ALJ erred in attributing Hermany's anti-union expressions to Parsippany.

Parsippany further contends that it was improper for the ALJ to rely on the Company's surveillance activity as evidence of anti-union animus. However, surveillance of employees violates Section 8(a)(1) of the Act, and as this court held in *Teamsters Local Union No. 171*, 863 F.2d at 956, violations of Section 8(a)(1) evidence anti-union animus. Perhaps in an attempt to avoid the holding of that case, Parsippany argues that its surveillance activity provides no evidence of anti-union animus because its surveillance activity, if any, was "*de minimis* and not suggestive of overt, aggressive anti-union animus." We are baffled by this argument. To the extent that Parsippany is suggesting that its surveillance activity was unintentional, its position is untenable. The ALJ found that additional security officers were brought to the New Jersey facility in the week preceding the representation election. Upon arriving, Parsippany managers met with these security officers and specifically identified union activists for them. These guards then engaged in surveillance of company employees for up to three hours at a time, and rhetorically questioned employees concerning their desire for a union. Parsippany's Section 8(a)(1) violation classically evidenced anti-union animus.

Parsippany also objects to the ALJ's reliance on the Company's surveillance activity on the ground that there was "no nexus whatsoever" between the surveillance activity and the disciplinary action taken against LaRussa. While we have required that the General Counsel establish proximity in time between alleged reprisals and an employee's union activity, *see MECO Corp.*, 986 F.2d at 1437, Parsippany cites no case in which we have required the General Counsel to demonstrate a "nexus" between each item of employer conduct evidencing anti-union animus

and a reprisal taken against an employee. Indeed, rather than requiring a link between conduct evidencing anti-union animus and a reprisal, we have held that anti-union conduct *acts as the link* between an employer's knowledge of an employee's union activities and reprisals taken against that employee. *Id.* Therefore, Parsippany's "nexus" argument is without merit.

In sum, we conclude that it was proper for the ALJ to rely on the Hermany speech and the Company's surveillance activity as evidence of anti-union animus. Given the existence of anti-union animus on the part of Parsippany as well as Parsippany's knowledge of LaRussa's union activity and the proximity in time between LaRussa's last concerted activity (*i.e.*, voting in the representation election on April 22) and the disciplinary action taken against him (*i.e.*, warnings on May 6 and June 15; discharge on June 18), we cannot say that it was unreasonable for the Board to conclude that LaRussa was disciplined and discharged because of his union activity.

■ Parsippany responds that even if the disciplinary actions taken against LaRussa were motivated in part by anti-union animus, the Company would have taken the same action against LaRussa regardless of his union activity. Thus, Parsippany asserts, the second prong of the *Wright Line* test prohibits a finding that the Company violated the Act, and the ALJ's conclusion to the contrary results from a failure to consider "all relevant factors." We disagree.

Parsippany first argues that the ALJ failed to consider the testimony of two witnesses that LaRussa was informed of the Company's new clock-in policy on May 4, prior to his violation of the policy on May 5 and 6. The ALJ considered the testimony, he simply did not credit it. There was conflicting evidence before the ALJ concerning the date on which LaRussa was informed of the Company's new clock-in policy. Two Company managers, Wester and Kalantary, both testified that LaRussa was informed of the new clock-in policy after the meeting with all employees on May 4. However, LaRussa testified that he was not told of the new policy until after he had clocked in early

on May 6. Given this conflicting testimony, the ALJ was required to make a credibility determination, a determination which was "difficult" because he "found LaRussa, Kalantary, and Wester to [all] be fairly credible witnesses." Looking to circumstantial evidence to resolve this dilemma, the ALJ elected to "credit LaRussa's testimony" that he was not informed of the new clock-in policy until after he clocked in early on May 6.

An ALJ's credibility determinations, as adopted by the Board, must be accepted by this court "unless they are patently insupportable." *Exxel/Atmos, Inc. v. N.L.R.B.*, 28 F.3d 1243, 1246 (D.C.Cir.1994) (internal quotations omitted). On this record, we are unable to conclude that the ALJ's credibility determination ran afoul of this standard. As noted by the ALJ, Wester had previously provided conflicting evidence concerning the date on which she notified LaRussa of the new clock-in policy. In an affidavit filed with the Board, Wester stated that she "was unsure of the specific date" of the meeting she held with employees. She further stated in that affidavit that she spoke to LaRussa concerning the new policy "a couple of days after th[at] meeting." However, when Wester testified before the ALJ, Wester stated firmly that she held the meeting with her employees on May 4, and informed LaRussa of the new policy "later that afternoon." The ALJ relied on this discrepancy in making his credibility determination. The ALJ further relied on the fact that Company time cards showed that Joan Roetto, a banquet server at Parsippany, punched in early on May 5. Roetto impressed the ALJ as an employee who "[went] by the book," and thus would not have punched in early on May 5 had Wester's meeting with the employees been held prior to that date. Because the ALJ believed the meeting with employees was held after May 4 and because Wester testified that she did not work on May 5, the ALJ concluded that LaRussa was not informed of the new clock-in policy until after he clocked in early for work on May 6. This circumstantial evidence provided more than a sufficient basis for the ALJ's conclusion. The Board adopted the ALJ's decision, and we thus defer to the Board's conclusion that LaRussa was not informed of the new clock-

in policy until after he clocked in early on May 6.

Parsippany also takes issue with the Board's finding that it was improper to discipline LaRussa for failing to arrive at work on Sunday, June 13. The ALJ found that LaRussa was denied his request that he be allowed to take Sunday off despite the fact that he made a timely request for such in accordance with the Company's established policy. When LaRussa asked why his request had been denied, the ALJ found that Wester provided "no valid reason." The ALJ further found that despite this unwarranted rejection of LaRussa's request, LaRussa nonetheless obtained McKay to cover his shift. However, Wester rejected McKay as a substitute on the ground that because McKay had in the past not worked for Wester on Sunday for religious reasons, she was not an acceptable substitute for LaRussa. Having been frustrated in his two attempts to take Sunday off in accordance with Company policy, LaRussa simply refused to arrive at work on Sunday. Given the Company policy of permitting employees to take a day off if they either notified their manager or secured a substitute, the ALJ concluded that Parsippany's reliance on LaRussa's absence as a basis for discharging him was a mere pretext. Given the extensive evidence before the ALJ, his conclusion was not unreasonable.

Parsippany argues in response that Wester did not reject McKay as a substitute. Rather, Parsippany argues, Wester was never notified by McKay that she would cover for LaRussa. This argument is simply another challenge to the ALJ's credibility determination. According to Parsippany, the Board's conclusion was unjustified because it failed to consider "the undisputed and corroborated testimony" of Wester that as late as Friday night she was attempting to contact McKay to confirm that she would cover LaRussa's Sunday shift. However, the ALJ explicitly "discredit[ed]" Wester's testimony that she was willing to accept McKay as LaRussa's substitute. Instead, the ALJ accepted LaRussa's testimony that upon notifying Wester that McKay would cover the Sunday shift, Wester responded that "she's

[McKay] not working for you." As stated above, this court will accept an ALJ's credibility determination so long as it is not "patently insupportable." *Exxel/Atmos, Inc.*, 28 F.3d at 1246. Parsippany essentially argues that because Wester's testimony was in conflict with that of LaRussa, it was improper for the ALJ to adopt LaRussa's version of events. This argument is without merit. The mere fact that conflicting evidence exists is insufficient to render a credibility determination "patently insupportable," since such a conflict is present in every instance in which a credibility determination is required.

### III. CONCLUSION

We find no merit in Parsippany's argument that there was insufficient evidence on which to find that the Company engaged in unlawful surveillance and discriminatorily disciplined and discharged LaRussa without cause. While perhaps Parsippany could have advanced a persuasive argument that the ALJ erred in permitting the General Counsel to amend his complaint to include the anti-union speech allegation, because Parsippany failed to raise the claim before the Board or in its opening brief to this court, we find it to be waived under Section 10(e) of the Act. In addition, the Board's unchallenged finding that Parsippany violated the Act when the Company's General Manager, Hermany, gave an anti-union speech, is also affirmed. We therefore deny the petition for review and grant the cross-petition for enforcement.