United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 9, 1998 Decided October 2, 1998 

 No. 97-1689

 National Steel and Shipbuilding Company, 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 Shipwrights, Boatbuilders & Helpers, Carpenters

 Local No. 1300, et al., 

 Intervenors

 On Petition for Review and Cross-Application

 for Enforcement of an Order of the

 National Labor Relations Board

 Van A. Goodwin argued the cause for petitioner. With 
him on the brief was William C. Wright.


 David Habenstreit, Supervisory Attorney, National Labor 
Relations Board, argued the cause for respondent. With him 
on the brief were Frederick L. Feinstein, General Counsel, 
Linda Sher, Associate General Counsel, John D. Burgoyne, 
Acting Deputy Associate General Counsel, and Vincent J. 
Falvo, Jr., Attorney.

 David Rosenfeld and Stanley S. Mallison were on the brief 
for intervenors Shipwrights, Boatbuilders & Helpers, Carpen-
ters Local No. 1300, et al.

 Before: Edwards, Chief Judge, Ginsburg, and Rogers, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: The National Labor Relations 
Board determined that National Steel and Shipbuilding Co. 
(NASSCO) violated s 8(a)(1) of the National Labor Relations 
Act, 29 U.S.C. s 158(a)(1), when it videotaped its employees 
engaging in protected labor activities. The Board ordered 
the company to cease and desist from using, or conveying the 
impression that it is using, video and audio devices to record 
protected activities. NASSCO petitions for review, arguing 
that the Board lacks substantial evidence to support its 
conclusions, and the Board cross-petitions for enforcement of 
its order. We deny the petition for review and enforce the 
Board's order in full.

 I. Background

 NASSCO, which builds and repairs ships for the Navy and 
others, employs approximately 3,000 people in an enclosed 
industrial complex. Most employees enter the complex 
through Gate 6, which borders a large parking lot. Although 
the lot is on NASSCO's property, the Company has historical-
ly permitted the seven unions that represent its employees to 
hold rallies there. Nearby stands a shack staffed by three or 
four guards with a full view of activity in the lot and at Gate 
6. NASSCO also has a system of security cameras monitor-
ing its property, including two that cover the lot near Gate 6.

 NASSCO and the unions have a history of labor disputes, 
including strikes in 1980, 1984, 1988, and 1992, as well as an 
eleven-month period from 1987 to 1988 during which employ-
ees worked without a contract. The most recent strike began 
after the expiration of the collective bargaining agreement in 
September, 1992 and ended three weeks later, when 
NASSCO and the seven unions executed a "return to work" 
agreement. When that agreement expired in February, 1993, 
the two sides still had not reached agreement on a new 
contract and NASSCO unilaterally implemented its final of-
fer. The unions decided not to strike, but instead to work 
without a contract and, as in 1987-1988, to pursue a so-called 
"inside game." Their strategy was to put pressure on the 
Company while the employees remained on the job, thereby 
avoiding the risk of replacement that attends a strike. Pur-
suant to this strategy, the unions held rallies in front of Gate 
6 each morning at 6 a.m., before the morning shift change.

 In order to videotape these rallies, which typically attracted 
about 100 employees, NASSCO's chief of security, Eugene 
Hutchins, placed a tripod-mounted camera atop Building 15, a 
two-story structure adjacent to Gate 6. The videotaping 
lasted from February through May, 1993. Additionally, 
NASSCO stationed Woody Breece, an industrial relations 
staff member, in the shack near Gate 6 with a video camera 
and instructions to tape any harassment or violence that 
occurred. Breece never had occasion to use the camera, 
although once while bantering with an employee Breece 
aimed the camera at him in jest. In October, 1993 NASSCO 
installed a permanent video camera, equipped with a micro-
phone, atop Building 15. In response to union complaints, 
NASSCO removed the microphone but then attempted to 
reinstall it at two other locations. The first proved to be too 
high to record conversations at ground level; installation at 
the second was halted after the unions again complained. As 
a result, the microphone was never operational.

 The unions filed unfair labor practice charges based upon 
each of the surveillance activities described above. After a 
hearing, an Administrative Law Judge issued findings and 
conclusions, holding that NASSCO violated s 8(a)(1) of the 


NLRA. The ALJ found that the videotaping at Gate 6 
violated s 8(a)(1) because NASSCO had not "honestly be-
lieved that unprotected misconduct was currently going on or 
was imminent." The ALJ also found that Breece's presence 
at the guard shack with a video camera violated s 8(a)(1) 
because, although not as coercive as actual videotaping, "to 
carry the camera is to threaten its use," which has a tendency 
to coerce. Finally, the ALJ held that installation of the 
permanent camera atop Building 15 violated s 8(a)(1) because 
it had unprecedented audio and video recording capabilities.

 The Board affirmed the ALJ's order with only two signifi-
cant modifications. See National Steel & Shipbuilding Co., 
324 N.L.R.B. No. 85 (Sept. 30, 1997). First, the Board 
disagreed with the ALJ's factual finding that the video re-
cording capability of the camera on top of Building 15 was 
unprecedented and accordingly eliminated that portion of the 
ALJ's order directing that the camera be dismantled. Sec-
ond, the Board read its precedent as requiring that an 
employer, before videotaping protected labor activity, have a 
"reasonable, objective basis," not merely an honest, subjective 
belief, for anticipating misconduct.

 The Board ordered NASSCO to cease using, or conveying 
the impression that it is using, video cameras or audio devices 
for the purpose of monitoring protected activities. The 
Board also required NASSCO to destroy the tapes of the 
Gate 6 rallies, to dismantle the audio capability of the Build-
ing 15 camera, and to post a notice to employees describing 
the Board's order.

 II. Analysis

 In its petition for review, NASSCO challenges the sufficien-
cy of the evidence supporting the Board's conclusion that it 
thrice violated the Act. The Board's findings of fact are 
conclusive if supported by substantial evidence and this court 
reviews the inferences drawn therefrom with considerable 
deference in light of the Board's expertise in these matters. 
See Avecor, Inc. v. NLRB, 931 F.2d 924, 928 (D.C. Cir. 1991).


A. Videotaping the Gate 6 Rallies

 Section 8(a)(1) of the NLRA makes it an unfair labor 
practice for an employer "to interfere with, restrain, or coerce 
employees in the exercise of the rights" to engage in concert-
ed collective activity guaranteed in s 7 of the NLRA. 29 
U.S.C. s 158(a)(1). An employer violates s 8(a)(1) if its 
actions have merely a "tendency to coerce, [regardless of 
their] actual impact" in a particular case. Avecor, 931 F.2d at 
932. The Board and the courts have long recognized that 
"absent proper justification, the photographing of employees 
engaged in protected concerted activities violates [s 8(a)(1)] 
because it has a tendency to intimidate." F.W. Woolworth 
Co., 310 N.L.R.B. 1197, 1197 (1993); see also Road Sprinkler 
Fitters Local Union No. 669 v. NLRB, 681 F.2d 11, 19 (D.C. 
Cir. 1982) (citing cases); Waco, Inc., 273 N.L.R.B. 746, 747 
(1984) (same). In Woolworth the Board concluded that pho-
tography and videotaping go beyond mere observation be-
cause "pictorial recordkeeping tends to create fear among 
employees of future reprisals." F.W. Woolworth, 310 
N.L.R.B. at 1197.

 The Board has also held that a reasonable, objective justifi-
cation for video surveillance mitigates its tendency to coerce. 
For example, an employer's legitimate security interests may 
justify its use of surveillance cameras, even if they happen to 
capture protected activities. See Lechmere, Inc., 295 
N.L.R.B. 92, 94, 99-100 (1989), rev'd on other grounds, 502 
U.S. 527 (1992). Similarly, if an employer has a "reasonable 
basis for anticipating picket line misconduct," then its employ-
ees have less reason to fear that the purpose of videotaping 
their protected activities is to aid in later taking reprisals 
against them. See Waco, 273 N.L.R.B. at 747. Gathering 
evidence for use in legal proceedings also constitutes a suffi-
cient justification for videotaping protected activities. See 
Roadways Express, Inc., 271 N.L.R.B. 1238, 1240, 1244 
(1984); see also NLRB v. Colonial Haven Nursing Home, 
542 F.2d 691, 701 (7th Cir. 1976) (holding that "anticipatory 
photographing .... does not violate s 8(a)(1) of the Act 
where the photographs are taken to establish for purposes of 
an injunction suit that pickets engaged in violence").


 NASSCO claims that it had all of these justifications for 
videotaping the Gate 6 rallies. First, NASSCO argues that 
the tripod-mounted camera served a security function because 
"[a]ll too often, unlawful or unprotected conduct occurs in-
stantaneously, with no warning, and is over within a matter of 
seconds." The short answer to this argument, for which the 
Board has substantial evidence, is that the Company already 
had security cameras monitoring the lot and guards with a 
full view of the Gate 6 area; the minimal additional security 
that videotaping may have provided, therefore, was out-
weighed by its tendency to coerce. Cf. Parsippany Hotel 
Management Co. v. NLRB, 99 F.3d 413, 420 (D.C. Cir. 1996) 
(upholding Board's conclusion that employer increased securi-
ty officers to seven from three in order to engage in surveil-
lance of employees, not to increase security).

 Second, the Company claims that it had a reasonable, 
objective expectation that misconduct was likely to occur. 
The Board concluded that NASSCO's support for this expec-
tation was either too remote in time or was limited to violence 
that occurred during a strike, which the Board found a poor 
basis for anticipating violence during the unions' pursuit of 
the "inside game." Again, the Board's conclusion is sup-
ported by substantial evidence, highlighted by NASSCO's 
inability to cite a single instance of non-strike misconduct 
occurring between 1984 and the initiation of the videotaping 
involved in this case nine years later. Moreover, the Board 
concluded that the videotaping continued long after NASSCO 
by its own action--namely, removing Breece from the guard 
shack after he reported that "nothing was going on"--"dem-
onstrated that it did not believe that violence or other miscon-
duct would occur." National Steel, 342 N.L.R.B. No. 85, at 3; 
see UAW v. NLRB, 455 F.2d 1357, 1368 (D.C. Cir. 1971) 
(upholding Board's finding s 8(a)(1) violation when photo-
graphing union activity "continued long after it became ap-
parent that there would be no violence on the picket line"); 
see also Road Sprinkler, 681 F.2d at 20 n.8 (agreeing with 
Board's judgment that photographs "taken over three weeks 
after the only reported incident of picket line misconduct" had 
"inherent tendency" to coerce).


 Finally, NASSCO attempts to justify videotaping the rallies 
at Gate 6 on the ground that it did in fact thereby gather 
evidence of misconduct. In this connection NASSCO claims 
that the ALJ relied upon its videotape of a morning rally at 
Gate 6 in concluding that the Company did not violate 
s 8(a)(1) when it videotaped union activity inside the plant 
that afternoon. NASSCO's characterization of the ALJ's 
decision is mistaken, however. The ALJ concluded that the 
afternoon activity was unprotected, and therefore that it was 
not an unfair labor practice for NASSCO to videotape it, 
based solely upon the contents of the afternoon videotape 
itself.

 As an alternative to its arguments that the videotaping was 
lawful under the Board's precedents because it rested upon a 
reasonable objective justification, NASSCO claims that the 
evidence in this case compels the conclusion that the video-
taping at Gate 6 did not in fact have a tendency to coerce 
employees. According to the Company, the Board's contrary 
conclusion therefore indicates that it impermissibly treated 
the videotaping as coercive per se. Cf. United States Steel 
Corp. v. NLRB, 682 F.2d 98, 101-03 (3d Cir. 1982) (holding 
that s 8(a)(1) does not prohibit photography per se, only 
photography that has a reasonable tendency to coerce). Spe-
cifically, NASSCO argues that the Board should have deter-
mined that the videotaping at Gate 6 had no tendency to 
coerce employees because NASSCO had a long history of 
videotaping protected union activity at Gate 6, NASSCO had 
never retaliated against an employee based upon protected 
activity it had videotaped, and the employees at the rallies 
appeared to be unfazed by the camera and indeed invited the 
local media to attend.

 In our view the Board could reasonably conclude, notwith-
standing this evidence, that NASSCO's video surveillance had 
a tendency to coerce employees. That about 100 union 
stalwarts were indifferent to the videotaping hardly compels 
the conclusion that the videotaping did not tend to coerce the 
other 2,900 employees. Nor, absent a reasonable objective 
justification for videotaping, need the Board find that the lack 
of past reprisals eliminates the tendency of videotaping to 


instill in employees a fear of future reprisals. We do not 
agree with the Company, therefore, that the Board has 
applied a per se rule against videotaping; rather the Board 
reasonably determined that NASSCO's proffered evidence 
was not of a type that necessarily ameliorates the coercive 
tendencies of videotaping.

 In sum, the Board's conclusion that NASSCO violated 
s 8(a)(1) when it videotaped union rallies outside Gate 6 is 
consistent with approved Board precedent and supported by 
substantial evidence.

B. The Other Section 8(a)(1) Violations

 NASSCO's challenges to the Board's conclusion that it 
violated s 8(a)(1) in two other respects may be resolved in 
short order. First, substantial evidence supports the Board's 
conclusion that adding audio capability to the Building 15 
camera violated the Act. NASSCO's response that it "has 
historically used video cameras with audio recording capabili-
ty during times of labor unrest" to record protected union 
activity near Gate 6 is, like its history of videotaping, insuffi-
cient to compel the conclusion that audio surveillance does not 
tend to coerce employees. NASSCO's claim that the camera, 
with its audio capability, was part of an on-going security 
upgrade, and therefore objectively justified under Lechmere, 
runs counter to substantial evidence in the record; in particu-
lar Hutchins, the Company's chief of security, testified that 
the camera was not part of that upgrade, and cameras 
installed as part of that upgrade did not have audio capability. 
Finally, contrary to NASSCO's suggestion, that the micro-
phone was never operational does not render this aspect of 
the Board's order moot; there is undisputed evidence that 
the camera still has audio capability. See NLRB v. Media 
Textile Mills, Inc., 339 U.S. 563, 567-68 (1950) ("A Board 
order imposes a continuing obligation; and the Board is 
entitled to have the resumption of the unfair practice barred 
by an enforcement decree.").

 Second, NASSCO failed in its opening brief to this court to 
contest the Board's finding that Breece's presence in the 


shack with a video camera violated s 8(a)(1). Consequently, 
that claim is waived and the Board is entitled to enforcement 
of the corresponding portion of its order. See, e.g., Parsippa-
ny Hotel, 99 F.3d at 418. NASSCO contends that until it 
received the Board's brief it did not know that Breece's 
conduct was the source of a separate violation of s 8(a)(1), 
i.e., apart from the videotaping at Gate 6 and the installation 
of a camera with audio capability at Building 15, but that 
contention is belied by the face of the Board's decision and 
order. See National Steel, 324 N.L.R.B. No. 85, at 1 n.2, 7.

 III. Conclusion

 For the foregoing reasons NASSCO's petition for review is

 Denied.