# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 7, 2015          Decided December 11, 2015

No. 14-1021

MIKE-SELL'S POTATO CHIP COMPANY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 14-1031

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Jennifer R. Asbrock* argued the cause for petitioner. With her on the briefs was *Eric S. Clark*.

*Micah P.S. Jost*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Elizabeth A. Heaney*, Supervisory Attorney.

Before: MILLETT, *Circuit Judge*, and SILBERMAN and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*:  Mike-sell's, a snack food manufacturer and distributor, challenges an NLRB determination that petitioner violated the NLRA (8(a)(5)) when it unilaterally instituted terms and conditions of employment for its employees represented by the Teamsters. Mike-sell's claims that it was entitled, under our precedent, to do so because negotiations with the Union had reached an impasse.  The Board, however, adopted the ALJ's determination that no impasse existed.  Although this is a close case – the Petitioner's predicament is unfortunate – we are obliged to affirm the Board and deny the petition.

I.

Petitioner had fallen on economic hard times, losing almost $5.5 million over four years, before the events in this case.  Its main competitor, Frito-Lay, was underselling the Company and taking increasing market share.  Frito-Lay, a much larger company, had apparently lower operating costs in part because it produced its own inputs.  Petitioner, on the other hand, was obliged to purchase commodities on the open market.

The Company employs three groups of unionized employees.  Its warehouse workers package the Company's manufactured products for distribution.  Its over-the-road drivers deliver product from the warehouse to regional distribution centers and warehouses.  And last, its route sales drivers deliver the product to local retailers, collect payments, and, importantly,

work to increase sales at the retail locations on their routes. While technically the Union is broken into two bargaining units – one for warehouse workers and one for drivers – negotiations have proceeded in the past, and continued as such in this case, separately for each of the three groups. Yet negotiations were coordinated. Although a separate collective bargaining agreement, running from October 26, 2008, to October 26, 2012, covered only the warehouse workers, an agreement covering both groups of drivers was almost co-extensive, running from November 17, 2008 to the same day in 2012.

Negotiations for new agreements started in the late summer of 2012. The Company, which showed the Union its books, sought from the beginning to lower costs by reducing its obligations in wages, pension and health care. The Union wished to maintain existing pensions and health benefits and restore wage cuts it had given up in prior negotiations. By the middle of November, the parties had reached agreement for the warehouse workers and over-the-road drivers on nearly all matters, including wages but not pensions and health benefits. It was agreed that those subjects would be resolved in the crucial route sales drivers negotiation.

Those negotiations were more complicated because, on top of the pension and health dispute, the parties also focused on direct compensation, the mix between commissions and fixed amounts. The Company proposed a change to the commission structure. The existing commissions were based on "gross sales," which does not reflect the amount Mike-sell's actually receives. The Company wished to substitute "net sales," which more accurately represents the Company's actual revenue. The Company also sought a reduction in commission rates. The Union wanted, by contrast, to preserve the existing commission structure and increase the rates.

The Company, seeking to avoid locking in its health care obligation, proposed that it be entitled to review it after only a year. It explained that the new Affordable Care Act could have unforeseen consequences. To further reduce its health costs, it proposed to cut off health care for retirees. As to pensions, the Company sought a reduction in its contribution, with employees picking up part of the costs. It later proposed that, at a minimum, its contribution rate be frozen.

Illustrating its financial squeeze, on October 10 the Company notified the Union it was selling routes and distribution centers in Ohio to independent operators (who would continue to service Mike-sell's). That caused the layoff of some thirty employees. Severance packages for the laid-off employees were agreed to two weeks later, as well as some other minor matters, but the Union rejected the Company's suggestion of a federal mediator to deal with the core issues of pensions, health benefits and commissions. Instead, the Union suggested the Company switch its health care provider to Central States.

The critical bargaining session took place November 14, three days before the expiration of the agreement. On that occasion, fatefully, for the first time, the Union was represented by counsel but the Company was not. The Union started out by seeking an extension of the contract. The Company responded it could not afford the contract terms, but did suggest a one-year extension if there was a modification of the commission structure in return for a slightly higher commission rate and a freeze of its pension contributions. The Union rejected that proposal and the parties continued to negotiate. Later in the day, the Union, for the first time, indicated a willingness to accept the Company's preferred commission structure ("net sales"), but it sought an increase in commission rates. The Company countered with a proposal that moved slightly towards the

Union's position.  The Union then agreed to an increase in employee contributions to the health plan, but its position still included a shift to the Central States health plan.

At 8:00 pm, without agreement on the major issues,[1] the Company suggested a further meeting two days later on November 16 – a day before the expiration of the agreement. The Company stated that it did not intend to extend the agreement.  The Union indicated its representatives were not available on the 16th, but it would be in touch to propose further days. (The parties did meet on the 15th to discuss the warehouse workers' contract.)

On November 16, the Company delivered the following letter to the Union (dated the day before):

> This letter will confirm our conversation of yesterday in which the Company asked to meet with your Union and your Union Committee with regard to our Labor Agreement for the Sales/Over-the-Road group, which is due to expire on November 17, 2012.  Since you indicated that you would not be available to meet either today or tomorrow, I wish to inform you that our last proposal to you, which was made on Wednesday, November 14, 2012...is the Company's full and final offer.  We have also attached a full and Final Offer for

---

[1]Petitioner claims it asked the Union to submit its position to the membership for a vote – which the Union declined. But the Union representative did not recall such a conversation and the ALJ did not make a finding on the issue.  Of course, a company is not entitled to insist on such a vote. *See NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342 (1958).

the Warehouse group. We would request that you take these Final Offers to a vote of the Union membership before the Labor Agreement expires.

The Company and Union representatives spoke briefly as the letter was delivered. The Union representative said it was only scheduling conflicts preventing a meeting prior to the expiration of the contract on November 17. On the 18th, the Company sent the Union another letter, declaring an impasse and stating it would unilaterally implement its last offer, which it did the next day. The Union, for its part, insisted that the parties were not at impasse. The Company and Union continued to negotiate in the months following the unilateral implementation, but never reached agreement.

\* \* \*

The ALJ's opinion, largely adopted by the Board, concluded that no impasse existed prior to Petitioner's unilateral imposition of its terms. He emphasized that the parties reached some agreements and that they went back and forth on pensions, health benefits, and route sales drivers' commissions – most notably on November 14. The Petitioner, according to the ALJ, did not indicate at that time that it had made a final offer, still less that an impasse had been reached and both parties were open to scheduling further negotiating sessions. Therefore, the declaration of impasse expressed on November 18 (following the "final" offer on the 16th) came abruptly, seemingly inconsistent with the tenor of the negotiations on the 14th.

The ALJ cited previous Board decisions holding that "an employer's declaration of impasse is not valid when it is motivated by an employer's determination to implement cuts immediately upon the expiration of the contract," *Newcor Bay*

*City Division of Newcor, Inc.*, 345 N.L.R.B 1229, 1240 (2005). The Board indicated that it did not rely on that conclusion.[2] Nor did the Board base its approval of the ALJ's decision on his discussion of negotiations that took place after the alleged impasse.

The ALJ further emphasized that the Union had made concessions and that "where a party has already made significant concessions indicating a willingness to compromise further," previous cases hold it would be "both erroneous as a matter of law and unwise as a matter of policy for the Board to find impasse merely because the party [that made concessions] is unwilling to capitulate immediately and settle on the other party's unchanged terms." *Grinnell Fire Protection Systems Co.*, 328 N.L.R.B. 585, 586 (1999).

## II.

Petitioner asserts that the Board's finding that no impasse existed at the time it instituted its "final offer" lacked substantial evidence. It is argued that the ALJ focused on progress on peripheral matters and ignored the parties' positions on the key issues of pension, health benefits and commissions (for route sales drivers). The ALJ also, according to Petitioner, improperly considered post-impasse bargaining as a factor in determining that no impasse existed. Petitioner reiterates the defense made before the ALJ (and Board) that the Union had engaged in dilatory bargaining tactics in an effort to avoid an impasse.

---

[2]If an employer unilaterally imposed terms after a contract expired "irrespective of the state of negotiations," that would be an obvious violation of 8(a)(5). *See CBC Industries, Inc.*, 311 N.L.R.B. 123, 127 (1993).

Finally, Petitioner offers a fallback position; even if no impasse existed prior to its institution of its last offer, an impasse was created the next February.

We can easily dispose of the last three contentions. Although it is clear that the Union wished to avoid an impasse, we don't think the ALJ's determination that the Union did not improperly delay bargaining sessions can be effectively challenged.  There were 12 total negotiation meetings and the Union's inability to meet on November 16 (the day before the contract expired), by itself, can not be regarded as evidence of a delaying tactic.  After all, the Union indicated it would get back to the Company with proposed dates.  The Union does not have to be available on two days' notice, and as discussed below, the expiration of the agreement does not have bargaining significance.

Petitioner's criticism of the ALJ's reliance on bargaining that took place after the Company put into effect its offer puzzles us.  The Board explicitly cordoned off the ALJ's discussion of that matter by deciding it did not rely on it when adopting the ALJ's recommended decision.  Petitioner's criticism, therefore, is irrelevant.  We have also considered the Company's fallback argument regarding an alleged impasse in February, but we think it is insubstantial and therefore does not merit discussion.

That leaves Petitioner's main argument and that, we think, is quite troubling – particularly in light of our precedent. *See TruServ Corp. v. NLRB*, 254 F.3d 1105 (D.C. Cir. 2001); *Laurel Bay Health & Rehabilitation Center v. NLRB*, 666 F.3d 1365 (D.C. Cir. 2012).  On the other hand, the government's response – that the Board's finding of no impasse is entitled to deference because it relies on the Board's expertise in evaluating the

parties' bargaining tactics and intentions – is also a powerful one.

To take a step back, the doctrine that an employer is entitled to institute its last offer after impasse is an ancient one in labor law. Its stated purpose is to accelerate negotiations. *See McClatchy Newspapers, Inc v. NLRB*, 131 F.3d 1026, 1032 (D.C. Cir. 1997). But it should be obvious that it presents an employer – at least one negotiating in good faith – with a powerful weapon. Therefore, typically a Union will seek to frustrate its use by attempting to avoid an impasse. *See*, *e.g.*, *Laurel Bay*, 666 F.3d at 1375.[3] This is analogous to another area of labor law in which an employer is not obliged to bargain at all – decisions concerning whether to discontinue a portion of its business. *See generally First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981). There too, the Supreme Court recognized that a union has every incentive to delay and impede any accommodation. *Id.* at 683-84; *see also Hawaii Meat Company v. NLRB*, 321 F.2d 397, 400 (9th Cir. 1963) (recognizing a union incentive to delay bargaining over a subcontract to replace strikers makes a bargaining requirement inappropriate). Thus although it is often said by both the Board and courts that an impasse exists when *both* parties believe bargaining has reached a dead end, as we recently recognized in *TruServ*, "[a] contemporaneous understanding as to impasse does not...require the parties to reach mutual agreement as to the state of negotiations." *TruServ*, 254 F.3d at 1117 (quotations

_____

[3]One exception to that incentive may be where a union has signed a "most favored nation" clause in other contracts which limits its freedom of action in bargaining.

omitted).[4]  If the law were otherwise, an employer would virtually never be entitled to implement a final offer.  It would, in effect, require the union's consent.

Therefore, we recently held in *TruServ* and *Laurel Bay* that if an employer maintains a firm position, and has made clear that acceptance of its position on particular issues is essential to agreement, a union's last minute movement, short of agreement, will not avoid an impasse.  For that reason, we reject the ALJ's statement that the Union does not have to "capitulate" to the Company's position to rebut an impasse.  That sounds like a substantive evaluation of the parties' positions which – it is black letter law – the Board may not do. *See NLRB v. American National Insurance Co.*, 343 U.S. 395, 404 (1952).

Of course, an employer must have bargained in good faith to be permitted to unilaterally institute its last offer after an alleged impasse.  But good faith bargaining simply means a desire to reach an agreement. *See United Steelworkers of America, Local Union 14534 v. NLRB*, 983 F.2d 240, 245 (D.C. Cir. 1993).  It does not mean that an employer is not entitled to insist on certain terms. *See Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310, 1317 (D.C. Cir. 2012).  Indeed, if an employer is not firm – at least eventually – on certain terms, it would be difficult to establish that an impasse exists.

---

[4]In addition to the "contemporaneous understanding of the parties as to the state of negotiations," the Board considers factors such as "the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, [and] the importance of the issue or issues as to which there is disagreement" in evaluating whether an impasse exists. *TruServ*, 254 F.3d at 1114 (quoting *Taft Board Co.*, 163 N.L.R.B. 475, 478 (1967)).

In the early days of collective bargaining, the typical case of an employer's claimed post-impasse institution of an employer's last offer involved an employer putting into effect an increase in compensation, although not as much as would meet the union's demand. *See, e.g.*, *NLRB v. Katz*, 369 U.S. 736 (1962). If an employer made a mistake – there was no actual impasse – the Board's remedy did not impose an economic penalty, just an order to restore the status quo. In other words, the downside risk of guessing wrong was not substantial. But if an employer, such as Petitioner, facing financial difficulty wishes relief from existing collective bargaining costs and therefore puts into place significantly diminished compensation, its risk is considerable because the Board, if it finds a violation of 8(a)(5) (no impasse existed), will order extensive back compensation, as it did in this case.

In that respect, an employer, facing a deadlock and planning a post-impasse institution of its last offer, is entitled to an understanding of clear legal principles that will govern its behavior. The situation is analogous to an employer contemplating discontinuing a portion of its business; in *First National Maintenance Corp.*, the Supreme Court emphasized that employers deserve a degree of certainty in that situation. *See generally First National Maintenance*, 452 U.S. at 675. Such is the case here as well.

Our precedent closely read, although it recognizes the Board's expertise, does set forth certain principles that govern at least our review of such cases. If an employer remains firm in collective bargaining as to one or more essential issues and

credibly[5] declares a last offer *in the negotiations*, a last offer that is consistent with and follows logically from its negotiating position, a union's failure to agree creates an impasse. A union official's denial that an impasse exists, combined with a new negotiating proposal that does not meet the employer's position, does not rebut an impasse. *See TruServ*, 254 F.3d at 1117; *Laurel Bay*, 666 F.3d at 1375.

\* \* \*

At the close of the bargaining on November 14, it would not have been apparent to a neutral observer that the parties had run into a brick wall. The Union, as we mentioned, armed with counsel, seemed to acquiesce in the Company's framework for route sales drivers' pay, which prompted the parties to go back and forth on percentages for commissions. Turning to health benefits, the Union suggested the possibility of a shift to Central States, proposing that a representative come and present its conditions. The Company negotiators (without counsel[6]) did not reject that notion, and they never put forth a last offer nor declared the parties were at impasse. Instead, two days later, apparently prompted by the termination of the collective

---

[5] *See Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 233 (D.C. Cir. 1996); *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1508 (7th Cir. 1991). Of course, if an employer repeatedly claimed different positions as a "last offer," it would not be credible. *See Teamsters Local Union No. 175 v. NLRB*, 788 F.2d 27, 31 (D.C. Cir. 1986). And as we noted in *TruServ*, at 1115-16, an employer benefits if it carefully explains how to identify its last offer.

[6] *Cf. Laurel Bay,* 666 F.3d at 1368 (noting that the company was represented by counsel throughout negotiations).

bargaining agreement, the Company, in writing, presented a "last offer" and later abruptly declared an impasse.

Under those circumstances, we think the Board's determination that an impasse had not been reached is a legitimate finding (a mixed question of fact and law). Petitioner had not displayed the requisite firmness on the key issues in negotiations, it had not made a last offer – a necessary if not a sufficient condition – nor declared an impasse in the crucial bargaining session.

Although the Board disavowed the ALJ's reliance on Petitioner's supposed intent to institute "cuts" following termination of the contract, without regard to the status of collective bargaining, the timing of the Company's abrupt declaration of an impasse and institution of the last offer does seem to be connected to the termination of the agreement. We have the impression that the Company was under the mistaken understanding that it was free to change the terms of employment conditions once the contract expired. But the law is clear that the terms and conditions of a collective bargaining agreement continue (with exceptions not here relevant) until either of the parties agrees to change the terms or an impasse is reached. *See Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 544 n.6 (1988). In any event, Petitioner did not carefully "touch the bases" that we have held obliges the Board to recognize the existence of an impasse thereby authorizing the institution of a last offer.

\* \* \*

For the above reasons, we deny the petition and grant the Board's cross-petition for enforcement.