# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────

Argued December 13, 2024          Decided March 7, 2025

No. 23-1235

HOOD RIVER DISTILLERS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

─────

Consolidated with 23-1270

─────

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

─────

*Sasha A. Petrova* argued the cause for petitioner. With her on the briefs was *Steven M. Wilker*.

*Heather S. Beard*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David*

2

*Habenstreit*, Assistant General Counsel, and *Elizabeth A. Heaney*, Supervisory Attorney.

Before: WALKER, CHILDS, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

Dissenting opinion filed by *Circuit Judge* WALKER.

PAN, *Circuit Judge*: In this petition for review, Hood River Distillers, Inc. challenges a decision and order of the National Labor Relations Board. The Board found that Hood River violated the National Labor Relations Act ("NLRA") by unilaterally changing the employment terms of its unionized employees even though its negotiations with the employees' union over a new collective bargaining agreement had not reached an impasse. On appeal, Hood River contends: (1) that the Board erred in concluding that the parties were not at an impasse, and (2) that even absent an impasse Hood River's unilateral conduct was lawful because the union had engaged in unjustified delay tactics. Because substantial evidence supports the Board's decision, we deny Hood River's petition for review and grant the Board's cross-application for enforcement.

**I.**

Hood River operates a liquor distillery in Oregon. The distillery employs approximately twenty-five unionized employees represented by Teamsters Local Union No. 670 ("the Union"). In January 2019, the Union and Hood River agreed to negotiate a new collective bargaining agreement.

Under the parties' prior agreement, which ran from March 2015 to February 2019, Hood River paid in full for certain unionized employees to receive health insurance through the

Oregon Processors Employees Trust Fund ("OPET"). Hood River also provided a 401(k) match and permitted Union representatives to access the distillery to meet with employees. The parties' negotiations over a new agreement focused on these provisions and the issue of wages.

**A.**

Negotiations began in February 2019. During the first bargaining session, the parties agreed to a three-year contract term but were far apart on details. Among other things, the Union wanted a 6% annual wage increase, a more generous 401(k) match, and to keep its members on their existing OPET health plan. Hood River, by contrast, sought significant cuts to the employees' benefits. It proposed a three-year wage freeze and unlimited discretion to change the 401(k)-match program. Hood River also wanted the Union's members to move from OPET to the company-sponsored Cigna health plan. The company explained that it needed to reduce costs because it recently had sold its best-performing liquor brand, which made the company unprofitable.

Before the parties' next meeting, the Union evaluated the company's Cigna health plan and discussed the plan with its members. When the parties met again on June 24, 2019, the Union indicated that it was flexible on wages but firm on health benefits — its members wanted to remain on OPET. The next day, Hood River proposed that the Union's members could remain on OPET if, among other conditions, they agreed: (1) to pay half of any OPET rate increases, and (2) to accept a three-year wage freeze. In a counterproposal, the Union agreed to a three-year wage freeze. But the Union wanted Hood River to pay in full for any OPET rate increases and to maintain the existing 401(k)-match program with no changes. Hood River's negotiating team expressed enthusiasm about the Union's

proposal. They stated that it was a positive development, but they needed to secure final approval from Hood River's board of directors. Based on that statement, the Union understood that the parties had made a deal, subject to the board's consent to the Union's 401(k) proposal.

On July 17, 2019, Hood River's negotiating team met with their CEO, Ron Dodge, who was also a member of the company's board of directors. Dodge rejected the Union's June 25 proposal and told the company's negotiators that it was better to give in on wages while remaining firm on health benefits. On July 22, 2019, Hood River's negotiating team informed the Union that the company had rejected its June 25 offer. The Union was stunned. In August, it held meetings with its members to discuss the path forward. Following one visit by Union representatives to Hood River's distillery, Hood River accused the Union of violating the existing agreement's union-access policy.

**B.**

After Hood River changed its negotiating strategy and rejected the June 25 Union offer, a new phase of bargaining began on September 27, 2019, when the parties met again. After some back-and-forth, Hood River presented the Union with an offer labeled "final." The offer proposed to move the Union's members from OPET to the company's health plan; in return, the Union's members would receive a 1% wage increase in the second and third contract years, and the existing 401(k)-match program would remain unchanged. In addition, Hood River now sought changes to the union-access policy. Furthermore, Hood River informed the Union that the company was switching from its Cigna plan to a new plan provided through Blue Cross Blue Shield. The Union was surprised and said it would need additional time and information to evaluate the Blue Cross plan.

On October 3, 2019, Hood River provided the Union with information about the Blue Cross plan. The Union said that it would ask its third-party benefits administrator to perform a comparison between the OPET and Blue Cross plans. On November 1, Hood River emailed the Union that five weeks was "a reasonable amount of time" for the Union to conduct the comparison and that Hood River wished to "finalize the contract as soon as possible." J.A. 668. "Therefore," Hood River wrote, "our last presented offer on September 27, 2019" is our "last and final offer." J.A. 668. The company gave the Union until November 13 to accept or reject the offer. The Union did not respond by that date.

On November 14, 2019, Hood River declared an impasse and said that it would implement its September 27 offer on January 1, 2020. The Union denied that the parties were at an impasse. The Union explained that it was still awaiting the health-plan comparison and that it would reach out to schedule further bargaining sessions once it had the opportunity to discuss the comparison with its members.

On December 11, 2019, Hood River again declared an impasse. But the company said it was "willing to meet with the union prior to" January 1. J.A. 688. A week later, the Union explained that it had received the health-plan comparison and was "in the process" of discussing the Blue Cross plan with its members. J.A. 689. The Union proposed to hold bargaining sessions after the holidays. A Hood River official later admitted that the company's threats of impasse were merely an effort to "get back to the bargaining table." J.A. 2094.

The parties ultimately agreed to hold two bargaining sessions in January 2020. Both sessions were canceled, however. The first cancelation was due to an ice storm. The second scheduled session was canceled because one member of Hood River's bargaining team was recovering from surgery.

6

Hood River sought to reschedule for mid-February; the Union offered availability in early March.

The parties met again on March 10, 2020. After some back and forth, the Union proposed two options. Under the first option, the Union's eligible members would accept a wage freeze but remain on OPET. Under the second option, the Union's eligible members would switch to the Blue Cross plan in exchange for a 2% wage increase in all three contract years. Although Hood River considered the proposed wage increase excessive, it later remarked that it "was grateful for the Union's apparent willingness to show flexibility on health insurance and believed that an agreement was within reach." J.A. 903.

The parties' final bargaining session on March 30, 2020, took place by telephone due to the COVID-19 pandemic. Before that session, Hood River emailed the Union (1) to propose adding a fourth year to the contract; and (2) to propose a 1% wage increase in the second, third, and fourth contract years, in exchange for Union members switching to the Blue Cross plan.

At the bargaining session, the Union agreed to a four-year contract, a wage freeze in the first year, and for its members to switch health plans. But the Union sought wage increases of 3%, 3.25%, and 3.5% in the second, third, and fourth contract years, respectively. Although Hood River dismissed the Union's wage proposal as regressive, the Union explained — and the Board later found[1] — that the Union's March 30 proposal would cost Hood River less money than its March 10

---

[1]    Although these findings were made by an administrative law judge ("ALJ"), "[b]ecause the Board affirmed the ALJ's findings, we refer to those findings as made by the Board." *Thrifty Payless, Inc. v. NLRB*, 86 F.4th 909, 916 n.3 (D.C. Cir. 2023).

proposal because the wage freeze in the first year lessened the compounding effect in subsequent years.

In its counterproposal, Hood River maintained its prior position on wages but committed to specific health-plan deductibles and out-of-pocket maximums. The Union responded with a further concession on wages, reducing its proposed wage increases by 0.25% in each contract year.

Despite this progress, Hood River emailed the Union shortly after the bargaining session that the parties "appear to be at loggerheads" on wages, the 401(k)-match program, and the union-access policy, and that the company was "unwilling to entertain any further concessions on the wages." J.A. 885. Hood River then presented its "last, final and best offer," which maintained the company's prior position on wages and health benefits but offered to accept the Union's 401(k) proposal if the Union accepted revisions to the union-access policy. J.A. 885.

The Union replied that the parties should meet in person with a mediator. Hood River said that in-person mediation "is not acceptable given . . . COVID-19" but that the company would agree to virtual mediation. J.A. 884. The Union responded that "[a]fter convening via teleconference today and seeing where it landed us, . . . a meeting in person is absolutely necessary." J.A. 883.

Hood River then thanked the Union for "the progress the parties made today on health care," but said the parties "have come as far as they can go on the other open matters" and that the Union was engaging in "delay tactics . . . to maintain the status quo." J.A. 883. The Union "categorically denie[d]" Hood River's claim and noted that despite the company's prior impasse declarations, "the parties have reached a number of Tentative Agreements on issues that the Employer previously claimed impasse on." J.A. 886.

**C.**

In early April 2020, both parties communicated with the Federal Mediation and Conciliation Service. Union officials were aware that federal mediators were not conducting in-person mediations due to the pandemic, but Union officials thought the pandemic would end quickly and in-person mediation would soon resume.

On April 23, 2020, Hood River told the Union that its continued insistence on in-person mediation was an unlawful delay tactic, that the parties were at an impasse, and that the company would unilaterally implement its March 30 offer on May 1. Hood River said, however, it would "carefully consider" any proposals from the Union "to see if they may break the impasse." J.A. 904–05. The Union again emphatically denied that the parties were at an impasse.

Nevertheless, on April 27, 2020, Hood River instructed its unionized employees to enroll in the Blue Cross plan by May 1, 2020. And, on May 1, Hood River unilaterally implemented its March 30 offer.

Days later, the Union's members went on strike. The Union claimed that the strike was in response to an unfair labor practice ("ULP") by Hood River — specifically, the company's unilateral implementation of its March 30 offer before negotiations had reached an impasse. Under settled principles of labor law, "employees who engage in an unfair labor practice strike are entitled to reinstatement to their former positions if they wish to return to work at the conclusion of the strike, even if the employer has hired replacements." *Spurlino Materials, LLC v. NLRB*, 805 F.3d 1131, 1137 (D.C. Cir. 2015). If, by contrast, employees go on an "economic" strike, they "run the risk of permanent replacement by new hires." *Gen. Indus. Emps. Union, Local 42 v. NLRB*, 951 F.2d 1308, 1311 (D.C.

Cir. 1991). Hood River, for its part, insisted that the strike was economic.

In mid-May 2020, Hood River began hiring replacement workers, mostly as temporary employees. In June 2020, Hood River threatened publicly to permanently replace the striking workers. A month later, the company followed through on its threat and announced that it had permanently replaced twenty-one strikers. The company said that it would reinstate returning strikers only if there were open positions.

In August 2020, the striking workers offered to return to work without conditions and demanded immediate reinstatement. Hood River denied that those employees had engaged in a ULP strike and claimed that because it had no open positions, it was not required to immediately reinstate the strikers. The Union filed ULP charges with the Board.

**D.**

Acting on the charges filed by the Union, the Board's General Counsel issued a complaint against Hood River, alleging that the company had committed several ULPs.

The case was tried before an administrative law judge ("ALJ") who heard testimony from both parties over eleven days in May and June 2021. In December 2021, the ALJ found that Hood River violated the NLRA, including by unilaterally implementing its March 30 offer absent an impasse. The ALJ emphasized that "the parties made significant progress" during their two bargaining sessions in March 2020. J.A. 425. The ALJ also rejected Hood River's assertion that it was privileged to unilaterally implement its March 30 offer absent impasse because the Union unreasonably delayed bargaining by insisting on in-person mediation. The ALJ reasoned that "[g]iven the uncertainty at the time about just how long the Covid-19 pandemic would persist, I do not find that the

Union's position was unreasonable." J.A. 425. Hood River appealed to the Board.

In August 2023, the Board affirmed the ALJ's decision in relevant part and found that Hood River committed six ULPs. The Board also expanded the remedy fashioned by the ALJ to include certain make-whole damages. Hood River timely petitioned for review, and the Board filed a cross-application for enforcement.

Hood River now challenges four of the six ULP determinations made by the Board,[2] and objects to the Board's expansion of the remedy. All four challenged ULP determinations flow from the Board's conclusion that Hood River was not entitled to unilaterally implement its March 30 offer. Hood River therefore concedes that if we affirm that conclusion and reject Hood River's challenge to the remedy, then the Board is entitled to enforcement of its entire order.

## II.

"Our review of Board unfair labor practice determinations is quite narrow." *Troutbrook Co. LLC v. NLRB*, 107 F.4th 994, 1000 (D.C. Cir. 2024) (cleaned up). We "ordinarily defer to the Board's fact-finding as to the existence of a bargaining impasse, unless the finding is irrational or unsupported by substantial evidence." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011) (cleaned up); *see also* 29 U.S.C. § 160(e) (directing courts to review the Board's factual

---

[2]    In particular, Hood River challenges the Board's determinations that it violated the NLRA by: (1) unilaterally implementing its March 30 offer, (2) threatening to permanently replace workers who were on strike in response to Hood River's unilateral implementation of that offer, (3) refusing to reinstate those workers upon their unconditional offers to return to work, and (4) ceasing to collect dues from employees' paychecks under the expired agreement.

11

findings for substantial evidence). Indeed, "few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience" of the Board. *Wayneview*, 664 F.3d at 348 (cleaned up).

Substantial evidence is a deferential standard of review. It requires only "enough relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Troutbrook Co.*, 107 F.4th at 1000 (cleaned up). Thus, we need not "agree that the Board reached the best outcome in order to sustain its decisions." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (cleaned up). Rather, "we reverse the Board only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Troutbrook Co.*, 107 F.4th at 1000 (cleaned up). And we accept the Board's credibility determinations unless they are "hopelessly incredible, self-contradictory, or patently unsupportable." *Wayneview*, 664 F.3d at 349 (cleaned up).

## III.

Applying that deferential standard of review, we affirm the Board's decision. Substantial evidence supports the Board's conclusion that Hood River acted unlawfully in unilaterally implementing its March 30 offer. Hood River, moreover, failed to preserve its challenge to the remedy. We therefore deny Hood River's petition for review and grant the Board's cross-application for enforcement.

## A.

Hood River first contends that it was entitled to unilaterally implement its March 30 offer because negotiations with the Union had reached an impasse. We disagree.

Under the NLRA, an employer must bargain in good faith with its employees' union over the terms and conditions of employment. *See* 29 U.S.C. § 158(a)(5), (d). "An employer

violates this duty to bargain if" it "unilaterally" changes employment terms "absent a final agreement or a bargaining impasse." *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1113 (D.C. Cir. 2001). "An impasse occurs only when both sides have exhausted the prospects of reaching a deal and are at the end of their rope" and "neither side is open to compromise," "leaving no realistic prospect that further discussions will be fruitful." *Thrifty Payless, Inc. v. NLRB*, 86 F.4th 909, 917 (D.C. Cir. 2023) (cleaned up). "[B]ecause the existence of an impasse is a question of fact," we review the Board's determination deferentially, evaluating only whether it was rational and supported by substantial evidence. *Wayneview*, 664 F.3d at 348.

Substantial evidence supports the Board's finding of no impasse. During the final bargaining session on March 30, both parties made significant concessions. Those "concessions . . . support the Board's view that . . . further bargaining might have produced additional movement." *Thrifty Payless*, 86 F.4th at 918 (cleaned up). On wages, Hood River offered to add a fourth year to the contract and proposed a 1% wage increase in that year. The Union, for its part, twice reduced the wage increases it sought.[3] On healthcare, the Union agreed to switch its members to the company-sponsored Blue Cross plan.

---

[3] Hood River asserts that the Union's first wage proposal on March 30 was regressive. But the Board carefully explained that the Union's proposal was not regressive, and Hood River gives us no reason, besides its own say-so, to doubt the Board's determination. Although "the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements," *TruServ Corp.*, 254 F.3d at 1116 (cleaned up), it may determine whether one party is making movement towards the other party's position, which is exactly what the Board did here, *see Thrifty Payless*, 86 F.4th at 918.

In exchange, Hood River committed to specific health-plan deductibles and out-of-pocket maximums.

Even as Hood River declared an impasse on March 30, it recognized that the parties had made headway and said it had more room to give. The company thanked the Union for "the progress . . . made today on health care." J.A. 883. And it proposed a further compromise: if the Union accepted Hood River's proposed revisions to the union-access policy, the company would agree to the Union's 401(k) proposal.

The Board thus reasonably determined that neither party was at the end of its rope. Rather, the Board reasonably found that Hood River impermissibly "cut[] off negotiations" "for its own administrative convenience," so it could move the unionized employees to the company's Blue Cross plan during the company's open enrollment period. *Hood River Distillers*, 372 N.L.R.B. No. 126, 4 (2023); *see also Times Union, Capital Newspapers*, 356 N.L.R.B. 1339, 1354 (2011) ("[R]ather than exploring whether the Union's change in position could serve as a basis to move the parties closer to an agreement . . . , the Respondent declared impasse" in order to carry out layoffs by its desired date "regardless of the state of negotiations."). Indeed, a manager for Hood River acknowledged that "since May is our plan renewal month, it made sense for us to move [employees to the new health plan on] May 1." J.A. 1960.

Hood River's reliance on *Mike-Sell's Potato Chip Co. v. NLRB*, 807 F.3d 318 (D.C. Cir. 2015) is misplaced. In *Mike-Sell's*, we explained that "if an employer remains firm in collective bargaining as to one or more essential issues and credibly declares a last offer in the negotiations," "a union's failure to agree creates an impasse." 807 F.3d at 324 (cleaned up). But contrary to Hood River's assertion, the company did not remain firm on wages — it agreed in late March to add an additional year with a 1% wage increase to the contract. Nor

did Hood River credibly declare a last offer in the negotiations. As the Board reasonably determined, Hood River's "repeated declarations of impasse" throughout late 2019 and early 2020, even as the parties continued to make progress in the negotiations, "prevented the Union from understanding when and if [Hood River] was truly at the end of its rope." *Hood River Distillers*, 372 N.L.R.B. No. 126, 4; *see also Mike-Sell's*, 807 F.3d at 324 n.5 ("Of course, if an employer repeatedly claimed different positions as a 'last offer,' it would not be credible."). In short, substantial evidence supports the Board's finding of no impasse.

**B.**

Even absent an impasse, Hood River claims it was entitled to unilaterally implement its March 30 offer because the Union engaged in unjustified delay tactics during the pandemic. "Although a negotiating party generally may not unilaterally impose contract terms without first bargaining to impasse, the Board has recognized an exception when, in response to one party's 'diligent and earnest efforts to engage in bargaining,' the other party 'insists on continually avoiding or delaying bargaining.'" *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 235 (D.C. Cir. 1996) (quoting *M & M Bldg. & Elec. Contractors, Inc.*, 262 N.L.R.B. 1472, 1472 (1982)). The Board has found this exception satisfied when a bargaining party "purposely obstruct[s] negotiations without any defensible justification" over a period of multiple months. *See Hood River Distillers*, 372 N.L.R.B. No. 126, 4 n.12 (collecting cases). The party seeking to invoke this exception bears the burden of establishing that the other party engaged in unjustified delay tactics. *See id.*; *see also Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000).

Before the Board, Hood River argued that "the Union's insistence on in-person mediation from late March to mid-April

2020 at the beginning of the Covid-19 pandemic" was an unjustified delay tactic. *Hood River Distillers*, 372 N.L.R.B. No. 126, 4 n.12. The Board found, however, that Hood River failed to carry its burden. *Id.* The Union had offered a good-faith reason for its insistence on in-person mediation. It told Hood River that "after convening via teleconference today and seeing where it landed us," in-person mediation "is absolutely necessary." J.A. 883. And that position was not unreasonable where, despite the Union's significant concessions at the virtual bargaining session on March 30, Hood River accused the Union of regressive bargaining and again made hollow claims of impasse.

Although federal mediators were unwilling to mediate in person at that early stage of the pandemic, Union officials testified that they believed the pandemic would end quickly and in-person mediation would resume. The Board credited the Union's explanations. *See Hood River Distillers*, 372 N.L.R.B. No. 126, 4 n.12. And because those credibility determinations are not "hopelessly incredible, self-contradictory, or patently unsupportable," we have "no basis" to disturb them. *See Wayneview*, 664 F.3d at 348 (cleaned up); *see also Thrifty Payless*, 86 F.4th at 917 n.5 ("Only the starkest error could justify setting [a credibility determination] aside."); *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 549 (D.C. Cir. 2006) ("Our review of the Board's motive determinations . . . is especially deferential." (cleaned up)).

Hood River offers its own interpretation of the Union's motivations. It contends that the Union delayed bargaining "to extend the [healthcare] benefits . . . enjoyed by Union members under the long-expired agreement." Hood River Br. 40. It points out that the Union declined Hood River's earlier offer to engage a mediator and only insisted on in-person mediation after the pandemic had made such mediation impossible. Although that is one way to view the Union's actions, record

evidence supports the contrary view adopted by the Board. Thus, "while it is possible that" the Union's insistence on in-person mediation was a bad-faith delay tactic, "there is certainly no evidence in the record that would *require* the Board to reach such a conclusion." *Serramonte Oldsmobile, Inc.*, 86 F.3d at 235 (emphasis added). Accordingly, we must defer to the Board. *See Troutbrook Co.*, 107 F.4th at 1000 ("We reverse the Board only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." (cleaned up)).

## C.

Our dissenting colleague would grant Hood River's petition on the ground that the Union engaged in unjustified delay tactics both before and during the pandemic, over the course of the parties' dealings from February 2019 to April 2020. In our view, that argument is not properly before us because Hood River did not squarely present and adequately develop it before the Board. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). We also believe that the argument fails on its merits.

Before the Board, Hood River argued that the Union engaged in unjustified delay in April 2020 when it "demand[ed] preconditions to bargaining that were . . . impossible due to COVID-19 restrictions." J.A. 334. The Board thus understood Hood River's invocation of the dilatory-tactics exception to be based on "the Union's insistence on in-person mediation" during the early weeks of the pandemic. *See Hood River Distillers*, 372 N.L.R.B. No. 126, 4 n.12.

That understanding is confirmed by Hood River's filing before the Board. Hood River's filing devoted twelve pages to

the dilatory-tactics exception and argued that the exception was satisfied based on the Union's demand for in-person mediation during the early pandemic. *See* J.A. 332–43. Only three stray sentences in that lengthy disquisition allude to any pre-pandemic delay by the Union. *See* J.A. 334, 338. Such "cursory" assertions failed to develop the distinct argument that the Union's purported pre-pandemic delay also contributed to its alleged dilatory tactics, and therefore were "insufficient to preserve the issue for appeal." *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 419 (D.C. Cir. 1996); *cf. Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly . . . .").

Our dissenting colleague disagrees with our conclusion that any dilatory-tactics argument that relies on pre-pandemic delay was not squarely presented and adequately developed before the Board. Dissent 9. But the dissent does not dispute that the Board understood Hood River's dilatory-tactics claim to rely solely on the Union's conduct during the pandemic. *See* Dissent 11. Nor does the dissent dispute that Hood River alluded to pre-pandemic delay only briefly and sporadically in the twelve-page section of its brief before the Board that addressed the dilatory-tactics exception. *See* Dissent 10. Instead, our dissenting colleague points to a different section of Hood River's 204-page brief, which discussed pre-pandemic delay in a different legal context. Dissent 10–11. That is insufficient to preserve the issue for appeal. To preserve an argument that the dilatory-tactics exception was satisfied based on pre-pandemic delay, Hood River had to present that argument "squarely and distinctly, or else forever hold its peace." *Schneider*, 412 F.3d at 200 n.1. The Board is

obviously not required to "sift pleadings and documents to identify arguments that are not stated with clarity by a petitioner." *New England Pub. Commc'ns Council v. FCC*, 334 F.3d 69, 79 (D.C. Cir. 2003) (cleaned up).

Even on appeal, Hood River has neither squarely presented nor fully developed the argument that the dilatory-tactics exception is satisfied based on pre-pandemic delay. Instead, Hood River again focuses its dilatory-tactics claim on the Union's conduct during the pandemic. While the Board does not contend that any claim based on pre-pandemic delay has been forfeited, the Board apparently is unsure whether Hood River has even made such a claim. A single sentence in the Board's brief states only that "[t]o the extent that Hood River claims the Union's insistence on in-person bargaining was a culmination of purported union delay tactics," that notion "is fully refuted." Board Br. 47. We will not fault the Board for failing to argue the forfeiture of a claim that was not clearly raised.

But even if this unpreserved argument were properly before us, we would have little trouble rejecting it. Our precedents leave no doubt that substantial evidence is a deferential standard of review. *See Island Architectural Woodwork, Inc. v. NLRB*, 892 F.3d 362, 370 (D.C. Cir. 2018) ("The substantial evidence standard requires 'a very high degree of deference.'" (quoting *Bally's Park*, 646 F.3d at 935)); *see also Biestek v. Berryhill*, 587 U.S. 97, 103, 107 (2019) (explaining that under the "deferential substantial-evidence standard," "the threshold for . . . evidentiary sufficiency is not high"). Under that deferential standard, we must "affirm the Board's findings unless no reasonable factfinder could find as [the Board] did." *Wendt Corp. v. NLRB*, 26 F.4th 1002, 1008 (D.C. Cir. 2022) (cleaned up). "[E]ven if we would have come to a different conclusion in the first instance," we are not free

to "substitute our own judgment" for the Board's. *Progressive Elec.*, 453 F.3d at 543.

Here, we respectfully disagree with our dissenting colleague that it is impossible for a reasonable factfinder to reach the same conclusion as the Board. The dissent appears to conclude that the Union must have intentionally delayed negotiations, and there can be no other explanation for its behavior, merely because the parties held only seven bargaining sessions over fourteen months, and the Union often sought to schedule each bargaining session a month later than Hood River proposed. Dissent 5–7. And yet, there are myriad possible explanations for that state of affairs, and we should neither act as factfinders ourselves nor substitute our judgment for that of the Board. Although the Board did not address the exact argument made by our colleague — because Hood River did not make that claim — substantial evidence supports the Board's conclusion that the Union did not engage in dilatory tactics.

Contrary to the dissent's narrative, the Union was not alone responsible for the duration of the negotiations and the delays experienced along the way. As the Board found, after five months of productive bargaining, the parties had made significant progress and appeared to reach a deal, subject to final approval by Hood River's leadership. It was Hood River's negotiating team that took nearly a month to discuss the deal with the company's CEO. And then, Hood River's CEO rejected the deal and told the negotiating team to change its negotiating strategy altogether, which set the negotiations back to square one. Hood River's negotiating team took another week to communicate the company's rejection to the Union by email.

When the parties returned to the negotiating table in late September 2019, a new phase of bargaining had begun. At the

September bargaining session, Hood River surprised the Union by announcing that the company would switch healthcare plans. The Union explained that it would need time to evaluate the new plan and discuss the plan with its members. The parties eventually agreed to meet again after the holidays in January 2020, but both of those sessions were canceled through no fault of the Union. The parties then held two productive bargaining sessions in March 2020 before the pandemic hit.

While it is possible that the Union engaged in some intentional delay, it is certainly not the only reasonable interpretation of the above-described events. Although the dissent thinks the Union should have evaluated the Blue Cross plan more quickly and scheduled bargaining sessions more promptly, Dissent 6–7, the Board explained that Hood River "was seeking drastic changes to the status quo" and such changes take time to sort out, *Hood River Distillers*, 372 N.L.R.B. No. 126, 3. Because a reasonable factfinder plainly could reach the Board's determination, we have no choice but to affirm it, based on the applicable standard of review.

**D.**

Finally, we decline to consider Hood River's contention that "[t]he Board erred by expanding the ALJ's award of 'make-whole' damages." Hood River Br. 44. That argument is not properly before us because Hood River never made it to the Board. *See* 29 U.S.C. § 160(e).

Just recently in *Thrifty Payless*, we explained that because a "party can challenge the Board's sua sponte amendment to a remedy by moving for reconsideration of the Board's decision," "a party must give the Board the first go at resolving such arguments." 86 F.4th at 921. Hood River concedes that it "did not seek reconsideration from the Board after [the Board] issued its updated remedy." Reply Br. 18 n.8. Hood River's "failure to do so prevents consideration of the question

by the courts." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982).

Hood River argues that it did not need to seek reconsideration because it objected before the Board "to the ALJ's award of remedies." Reply Br. 18 n.8. But the company's challenge before us is different. It objects not to the remedy fashioned by the ALJ, but to the Board's sua sponte expansion of that remedy. *See* Hood River Br. 44 ("The Board erred by expanding the ALJ's award of 'make-whole' damages . . . ."). Because Hood River never made that objection to the Board, we cannot consider it. *See* 29 U.S.C. § 160(e). And to the extent Hood River attempts in its reply brief to recast its claim as a challenge to the ALJ's original remedy, "[t]hat will not suffice." *Fore River Residents Against the Compressor Station v. FERC*, 77 F.4th 882, 889 (D.C. Cir. 2023). "Arguments raised for the first time in a reply brief are forfeited." *Id.*

\* \* \*

Because substantial evidence supports the Board's decision, we deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered.*

WALKER, *Circuit Judge*, dissenting:

Federal labor law requires unions and employers to bargain in good faith. Here, the overwhelming weight of evidence shows that the Union failed to meet that standard. Because the majority reaches a different conclusion, I respectfully dissent.

### I. The Union Met With Hood River Only 7 Times In 14 Months.

Hood River Distillers sells whiskey. The Teamsters Union represents about 25 of Hood River's employees. In February 2019, Hood River and the Union began negotiating a new collective bargaining agreement.

In prior negotiations, the two parties reached agreements quickly. But this time, negotiations lasted 14 months and ended without an agreement. During those 14 months, the Union rejected more than 70 proposed dates for meeting with Hood River. Instead, the parties met only 7 times.

From the start, the Union stalled. After the first and second bargaining sessions in February 2019, the Union spent a month ignoring Hood River's requests to meet in April and May. When the Union finally responded, it proposed dates in June.

After two meetings in June 2019, the Union continued to stall. It did not respond when Hood River asked to meet in August. Nine days later, when Hood River proposed new dates for August, the Union rejected them without providing any alternative dates. Nearly three weeks after that, the Union proposed dates for late September 2019 — three months after the parties' last meeting in June.

Shortly after the September 2019 meeting, in early October, Hood River asked for the Union's availability. Again, the Union declined. According to the Union, it needed more

time for a third party to compare the parties' respective health plans.

Then, in late October, Hood River checked in again. Still, the Union refused to set a bargaining date. Instead, it demanded more time to compare the two health plans.

In early November 2019, Hood River reached out again. And once again, the Union ignored Hood River. Finally, when Hood River declared an impasse nearly two weeks later, the Union responded. But even then, while denying any impasse, the Union still refused to provide availability — citing the need for even more time to compare the health plans.

When the Union completed a comparison of the health plans in late November 2019, the Union did not reach out to Hood River to propose negotiating dates. Rather, Hood River, amid the radio silence, requested dates again on December 11. And even after that, the Union stalled for time. The Union said it needed more time to *review* the comparison. By that point, the comparison had been complete for nearly three weeks, and the project of comparing and reviewing the plans had been ongoing for nearly three months.

The Union told Hood River it would not meet until January 2020 — 13 weeks after it started comparing the health plans. Then, after unforeseen circumstances prevented the parties from meeting in January — a winter storm made travel unsafe, and Hood River's negotiator had a medical emergency — the Union refused Hood River's request to meet in February. Instead, it offered dates for March.

In March 2020, the Union sat down at the negotiating table for the first time in nearly six months. The parties met again later that month. When that meeting did not lead to an

agreement, the Union suggested mediation — and insisted that the mediation be *in person*.

That insistence mattered because it followed the recent onset of the COVID-19 pandemic, when little else was happening in person. What's more, Hood River had itself proposed mediation about a month earlier — before the pandemic lockdowns began — only to be rebuffed by the Union. Now, with pandemic-era restrictions in place, the Union changed its mind. And though Hood River agreed to mediate, it pointed out the obvious — any such meeting needed to be done remotely. Yet the Union maintained that an in-person meeting was "absolutely necessary."[1]

For weeks after that, the Union refused to schedule a virtual meeting. So in late April 2020, Hood River declared impasse and informed the Union it would implement its final offer. That was essentially the same offer Hood River had made in September 2019, though it extended the offer for an additional year because the negotiations had by then lasted 14 months.

Those 14 months profited the Union employees. Because Hood River had sold off a whiskey brand that previously generated 70% of its income, Hood River sought slower wage growth and manageable healthcare costs. By stalling for 14 months, the Union staved off those changes.[2]

---

[1] JA 883.

[2] Plus, Hood River had already gifted to every employee an unusual and generous transaction bonus equal to six months' pay after the whiskey brand sale, regardless of any employee's contribution to the sale process. *Id.* at 1793.

Hood River unilaterally implemented its final offer in May 2020. The Union went on strike. The National Labor Relations Board's general counsel pursued unfair labor practice charges against Hood River and won before an administrative law judge. The NLRB affirmed. Hood River petitioned for review, and the Board cross-applied for enforcement.

## II. An Employer May Unilaterally Alter Employment Terms If A Union Engages In Dilatory Bargaining Tactics.

The National Labor Relations Act prohibits unfair labor practices.[3] It is an unfair labor practice for a union or an employer "to refuse to bargain collectively."[4] So, in general, an employer must not unilaterally alter "wages, hours, and other terms and conditions of employment."[5] But an employer may do so if "the union engages in dilatory tactics to delay bargaining."[6]

In its advocacy to the NLRB, Hood River argued that it lawfully altered conditions of employment without an agreement because the Union's tactics were dilatory. The NLRB disagreed. We review that finding for substantial evidence.[7]

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a

---

[3] 29 U.S.C. § 158(a), (b).

[4] *Id.* § 158(a)(5), (b)(3).

[5] *Id.* § 158(a), (d).

[6] *Thrifty Payless, Inc. v. NLRB*, 86 F.4th 909, 919 (D.C. Cir. 2023).

[7] 29 U.S.C. § 160(e), (f).

conclusion."[8]  That has been understood to be a deferential standard of review.[9]  But it does not require us to ignore economic realities like the Union's incentive to preserve the status quo rather than reach an agreement with Hood River.  So when we consider the record in this case, we must ask whether enough evidence supports the NLRB's finding that the Union resisted the temptation to delay for the sake of delay.[10]

### III. The NLRB's Rejection Of Hood River's Dilatory-Tactics Defense Lacked Substantial Evidence.

Substantial evidence does not support the NLRB's finding that the Union bargained in good faith.  At nearly every opportunity, the Union delayed the bargaining process.  To excuse that delay, the Union often gave pretextual reasons.  At other times, it gave Hood River no reasons at all.

Begin with the fact that the parties met only 7 times over 14 months to resolve a relatively simple contract dispute

---

[8] *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938).

[9] *Cf.* Robert P. Charrow & Laura M. Klaus, *Substantial Evidence — A Hodgepodge of Ambiguous Meanings Leading to Questionable Deference*, Yale J. Reg.: Notice & Comment (Aug. 5, 2024), https://perma.cc/7RMQ-F8W8.

[10] *Cf. Southwestern Portland Cement Co.*, 289 N.L.R.B. 1264, 1273 (1988) ("*[T]he Union was content to sail along with unit employees operating under the terms and conditions of employment of the expired contract.* This they were entitled to do unless the Employer bargained to impasse and thereafter lawfully implemented; unless the Union, by its bargaining tactics, would be deemed to have been engaged in stalling tactics that would invoke the narrow employer privilege to lawfully implement without impasse . . . ." (emphasis added)).

involving about 25 employees. During that time, Hood River says it proposed "*more than 80 bargaining dates.*"[11] Even granting that circumstances beyond the Union's control accounted for the delay of one month, the Union met with Hood River fewer times in about a year than some negotiators (who reached impasse) met in a few months.[12]

The Union lacked plausible reasons — other than intentional delay — for rejecting more than 70 of Hood River's proposed bargaining dates. Many times, the Union simply ignored Hood River's requests. It ghosted Hood River for a month when Hood River sought to meet in April and May 2019. Then it ghosted Hood River again when Hood River wanted to meet in August 2019. Later, when Hood River once again proposed August dates, the Union rejected those dates and waited nearly three more weeks without suggesting any alternatives.

When the Union did schedule meetings, it almost invariably insisted on meeting a month later than any dates Hood River proposed. When Hood River wanted to meet in

---

[11] Petitioner Br. 29; *see also* JA 504, 518, 591, 594-95, 602, 664, 674, 692, 701-02, 884, 889, 891.

[12] *See, e.g.*, *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1110 n.3, 1118 (D.C. Cir. 2001) (impasse after 8 meetings in 6 weeks); *AMF Bowling Co. v. NLRB*, 63 F.3d 1293, 1296-97, 1301 (4th Cir. 1995) (impasse after 7 meetings in about 6 weeks); *NLRB v. Gibraltar Industries, Inc.*, 653 F.2d 1091, 1094-96 (6th Cir. 1981) (impasse after 2 meetings in 8 weeks); *I. Bahcall Industries, Inc.*, 287 N.L.R.B. 1257, 1262 (1988) (impasse after 6 meetings in 6 weeks); *Hamady Bros. Food Markets, Inc.*, 275 N.L.R.B. 1335, 1336-38 (1985) (impasse after 5 meetings in nearly 9 weeks); *McAllister Bros., Inc.*, 312 N.L.R.B. 1121, 1122, 1125-29 (1993) (impasse after 8 meetings in nearly 11 weeks).

April or May 2019, the Union (eventually) proposed June. When Hood River wanted to meet in August 2019, the Union (eventually) proposed September. When Hood River wanted to meet in December 2019, the Union (eventually) proposed January 2020. And when Hood River wanted to meet in February 2020, the Union proposed — you guessed it, Kreskin — March.

When the Union gave a reason for its delay, it didn't give a very good reason. From early October 2019 until January 2020, the Union demanded more and more time to compare the proposed health plans. But it doesn't (or shouldn't) take a union that long to compare two health plans.[13] Nor is it obvious why the Union needed a third party to compare them. Many Americans have only two weeks to compare health plans during a typical open enrollment period.[14] Considering that comparing health plans is supposedly among a union's core competencies, "a reasonable mind" should view the Union's excuse as a dilatory tactic that successfully thwarted a meeting with Hood River in October, November, and December 2019.[15]

---

[13] *Cf.* JA 1920 (testimony of Hood River's representative) ("Well, if you're compl — comparing the two plan summaries and you already had one done, with not a lot of changes to the second one of our insurance, I think anybody could've done it in an afternoon, quite frankly. I could've done it in an afternoon.").

[14] Justin Held, *What is a Typical Open Enrollment Period? 10 Stats for Your Plan to Consider*, International Foundation of Employee Benefit Plans (Oct. 6, 2020), https://perma.cc/CK4D-Z3QT.

[15] *Consolidated Edison*, 305 U.S. at 229.

Delay is also the most likely reason the Union insisted on in-person mediation once COVID-19 lockdowns began in March 2020. Recall that the Union turned down Hood River's request for mediation in February 2020. Then, once the pandemic made in-person mediation next-to-impossible, the Union suddenly saw it as "absolutely necessary."[16]

To be sure, if the Union's demand for in-person mediation in March 2020 were Hood River's only evidence of delay, perhaps substantial evidence would support the NLRB's decision in this case. But the Union's eleventh-hour revelation on mediation — that it suddenly needed what the pandemic suddenly precluded — was just one of many ingredients in the Union's cocktail of dilatory tactics. Other evidence includes the Union's incentive for delay, the length of the negotiations compared to the parties' history of quick bargaining, and the Union's frequent failures to provide plausible reasons for refusing to negotiate in a timely manner.

---

If the Union was "surprised" by Hood River's September 2019 change of health plan administrators, Majority Op. at 4, 20, such surprise was unjustified because Hood River informed the Union about that potential change during the first bargaining session in February 2019. JA 408.

[16] *Id.*

In a footnote, the NLRB accepted the Union's claim that it believed the pandemic-related restrictions would soon lift, making it reasonable to insist on a federal mediator. And perhaps the Union did believe the pandemic would end soon. But even so, the Union knew that its demand for in-person mediation would cause at least *some* delay. *Cf. Southwestern Portland Cement*, 289 N.L.R.B. at 1275-76 (the Union's "insistence on a Federal mediator was pretextual and advanced for the purpose of impeding collective bargaining" (emphasis omitted)).

Therefore, to the extent the NLRB affirmed credibility findings related to the Union's motives for demanding in-person mediation, "those determinations are hopelessly incredible" and "patently unsupportable."[17]  Put differently, "no reasonable factfinder could agree with the Board."[18]  The Union was "guilty of systematically evasive and dilatory bargaining that permitted" Hood River "to lawfully implement its last offer."[19]

## IV. Hood River Preserved The Full Scope Of Its Dilatory-Tactics Defense.

The majority asserts that Hood River failed to "adequately develop" its argument that "the Union engaged in unjustified delay tactics both before and during the pandemic, over the course of the parties' dealings."[20]  That contention, not raised by the NLRB, is belied by the record.  Hood River lodged an

---

[17] *Wayneview Care Center v. NLRB*, 664 F.3d 341, 349 (D.C. Cir. 2011) (quoting *United Food & Commercial Workers Union Local 204 v. NLRB*, 447 F.3d 821, 824 (D.C. Cir. 2006)); *cf. M & M Contractors*, 262 N.L.R.B. 1472, 1478 (1982) (the employer "made diligent and earnest efforts to initiate negotiations" for 7 months but was "met with silence and with actions that gave it a reasonable basis for concluding that it was 'getting the runaround'"); *AAA Motor Lines, Inc.*, 215 N.L.R.B. 793, 794 (1974) (labor union held the employer's proposals "for almost 2-1/2 months" but "refused to meet and bargain").

[18] *T-Mobile USA, Inc. v. NLRB*, 90 F.4th 564, 574 (D.C. Cir. 2024) (cleaned up).

[19] *Southwestern Portland Cement*, 289 N.L.R.B. at 1276.

[20] Majority Op. at 16 (citing 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court")).

exception to the administrative law judge's dilatory-tactics finding, and Hood River included a robust argument against that finding in its accompanying legal brief to the NLRB.

In that brief, Hood River argued that the COVID-19 debacle "was just the latest episode in the Union's 14-month pattern of avoidance and delay."[21] Later in the same brief, Hood River argued: "After fourteen long months, much of it spent by [Hood River] waiting on bargaining dates or having bargaining sessions cancelled by the Union, the parties had reached the apex of either an agreement or impasse."[22] In addition, Hood River argued that the "extended duration of the bargaining history between [Hood River] and the Union" supported a finding of bad faith.[23]

All this followed Hood River's lengthy description of the Union's bad faith in the preceding section of its brief to the NLRB:

- "The Union engaged in a pattern of delay and surface bargaining";

- "[T]he ALJ failed to recognize that for over a year the Union engaged in bad faith surface bargaining designed to forestall impasse and in no way move the parties closer to agreement";

- "The Union's avoidance of scheduling bargaining dates was in bad faith";

---

[21] JA 334.

[22] *Id.* at 338.

[23] *Id.*

- "[T]he Union consistently either ignored [Hood River's] requests to bargain or took weeks or months to respond";

- "One cannot view this record in its totality and come to any conclusion other than that the Union intentionally delayed bargaining to avoid impasse and the concessions that would come with it – and all of this before the Union used the pandemic as an excuse to delay bargaining indefinitely";

- "The Union's six-month delay after the September 27, 2019 bargaining session—when it walked out without notice after receiving the employer's proposal—is truly astonishing."[24]

That all adds up to more than a "cursory exception before the Board to the ALJ's ruling."[25] It was an exception clearly and repeatedly "urged before the Board."[26] And to the extent the NLRB shared the majority's misunderstanding of Hood River's argument and failed for that reason to adequately address it, that shouldn't mean the NLRB wins; it should mean the NLRB loses.

---

[24] *Id.* at 295-300.

[25] *Parsippany Hotel Management Co. v. NLRB*, 99 F.3d 413, 419 (D.C. Cir. 1996).

[26] 29 U.S.C. § 160(e).

## V. Conclusion

Hood River preserved its entire dilatory-tactics defense. The NLRB's rejection of that defense lacked substantial evidence. I would therefore grant Hood River's petition for review and deny the NLRB's cross-application for enforcement.[27]

---

[27] Hood River also challenges the NLRB's finding that the parties had not reached a valid impasse. I have doubts about the soundness of the NLRB's reasoning regarding impasse. Courts have affirmed impasse occurring in as few as six weeks; here, the parties "bargained" for sixty. *See, e.g.*, *TruServ*, 254 F.3d at 1105, 1110 n.3, 1118 (D.C. Cir. 2001) (impasse after 8 meetings in 6 weeks). And the NLRB has identified no judicial opinion finding that an employer unlawfully declared impasse after the parties bargained for at least 14 months. Oral Arg. Tr. 23-24. But because the NLRB lacked substantial evidence to deny Hood River's dilatory-tactics defense, I would grant Hood River's petition without addressing impasse.

Separately, I agree with the majority that we cannot consider Hood River's objection to the NLRB's sua sponte award of "make-whole" damages because Hood River failed to move for reconsideration of that ruling. 29 U.S.C. § 160(e), (f); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982).